UNITED STATES DISTRICT COURT

EASTERN DISTRICT OF LOUISIANA

| | | |
|---|---|---|
| **MGMTL, LLC** | * | **CIVIL ACTION NO.: 20-2138** |
| | * | |
| | * | **JUDGE: WENDY B. VITTER** |
| **VERSUS** | * | |
| | * | **SECTION: D** |
| | * | |
| **STRATEGIC TECHNOLOGY** | * | **MAGISTRATE JUDGE: NORTH** |
| **INSTITUTE, INC.** | * | |
| | * | **DIVISION: 5** |

\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*

## AMENDED AND RESTATED COMPLAINT

MGMTL, LLC, for its amended and restated complaint against Strategic Technology Institute, Inc. asserts as follows:

## PARTIES

**1.**

MGMTL, LLC ("MGMTL") is a Louisiana limited liability company. Its members are Jorge Menes, who is domiciled in Louisiana, and Whit Himel, who is domiciled in Louisiana.

**2.**

MGMTL is a computer software company. It developed the Security Management and Reporting Tool ("SMART"), a computer software application designed to streamline and efficiently manage the complex tasks and requirements of United States Department of Defense security managers, government contracting companies, and other industries for which the management of personnel and their security clearances is a priority.

**3.**

Made defendant herein is Strategic Technology Institute, Inc. ("STI"), a Delaware corporation with its principal place of business in Rockville, Maryland.

## JURISDICTION AND VENUE

**4.**

This Court has subject matter jurisdiction over this case pursuant to 28 U.S.C. § 1338, as it is a copyright infringement claim under 17 U.S.C. § 101 *et seq*. This Court also has jurisdiction pursuant to 28 U.S.C. § 1332, as there is complete diversity of citizenship and the amount in controversy exceeds $75,000, exclusive of interest and costs. Apart from diversity jurisdiction, this Court also has subject matter jurisdiction over MGMTL's state law breach of contract and trade secret misappropriation claims under 28 U.S.C. § 1367.

**5.**

Venue is proper in this matter under 28 U.S.C. § 1391(b)(2) as a substantial part of the events or omissions giving rise to the claim occurred in the Eastern District of Louisiana and the distributor agreement at issue identifies Orleans Parish as the proper venue.

## FACTUAL BACKGROUND

**Menes develops and refines a security database in his free time over the course of several years; Menes transfers ownership of the database to MGMTL, and SMART is born; MGMTL obtains a registered copyright for SMART.**

**6.**

Beginning in approximately 1998, Jorge Menes, then a full-time college student, started teaching himself software coding and began creating a security management database at his home in his spare time.

**7.**

In 2013, Menes and his business partner, Himel, created MGMTL, a Louisiana limited liability company. Ownership of the security database and its intellectual property was put into MGMTL.

**8.**

Over time, the security database software was refined, including with the developmental help of Himel, and it ultimately evolved into the SMART software application at issue in this litigation.

**9.**

The SMART software application is unique and the first of its kind. SMART is a personnel and physical security application capable of evaluating thousands of personnel records, while applying Department of Defense rules, regulations, and applicable security clearance guidelines to each one. It is an extremely valuable tool used to efficiently manage all areas of security and security reporting.

**10.**

The SMART software application is not in the public domain and derives economic benefit from being maintained confidential.

**11.**

On September 27, 2013, MGMTL obtained a registered copyright for the SMART Security Management and Reporting Tool. The copyright registration number is TXU001883731. The certificate of registration is attached as Exhibit A.

**12.**

MGMTL previously granted the New Orleans office of the Marine Forces Reserve, a unit of the United States Marine Corps, limited permission to utilize its SMART software application on a trial basis. Although the Marine Forces Reserve took steps to obtain contracting approval and purchase software licenses for the office to continue using the SMART software application after expiration of the trial, budgetary restraints at the time ultimately prevented any such licensing agreement with MGMTL from being consummated.

**MGMTL and STI enter into a software evaluation agreement; STI receives access to the SMART software application, but it agrees to maintain the confidentiality of the software and agrees not to duplicate the program or use it for any purpose other than evaluation.**

**13.**

Since its formation in 1985, STI has provided various engineering and technical services to the United States Armed Forces and to many United States defense contractors. STI's clients include, among others, the U.S. Navy, the U.S. Marine Corps, the U.S. Air Force Sustainment Center, the U.S. Air Force, the U.S. Department of Defense, the U.S. Army, Northrup Grumman Corporation, and Lockheed Martin Corporation. Upon information and belief, STI has approximately 300 employees.

**14.**

In light of STI's experience and presence in the realm of government contracting, MGMTL and STI began discussing the possibility that STI would provide distribution, marketing, and other support services to MGMTL in connection with MGMTL's SMART software application.

**15.**

On May 27, 2015, MGMTL and STI entered into a software evaluation agreement. Exhibit B. The software evaluation agreement was signed by STI's Business Development Manager, Barry Levin. It granted STI "temporary access to the Program [*i.e.*, the SMART software application] for the purposes of evaluating [it] for the possibility of long-term licensing."

**16.**

In accordance with the software evaluation agreement, STI received a copy of the SMART software application and its underlying source code. STI was authorized to install and evaluate the software for a 30-day period. STI, in turn, acknowledged that the SMART software application contained confidential and proprietary information, and STI agreed to maintain the SMART software application in confidence to the same extent that STI maintains confidentiality to protect its own proprietary information. STI further agreed that it was not authorized to "duplicate the Program . . . disclose the Program to persons outside of [STI], or to use the Program for any purpose other than evaluation."

**17.**

If the parties did not end up entering into a licensing agreement, STI was obligated to remove the SMART software application "from all machines [on] which they have been installed, no copies of backups will have been made, and all originals and related materials will be returned in good condition."

**MGMTL and STI enter into a distributor agreement; STI acknowledges that the SMART software application is proprietary to MGMTL and agrees not to duplicate or reverse engineer the software. These contractual provisions remain binding even after <u>termination of the distributor agreement.</u>**

**18.**

Soon after executing the software evaluation agreement, the parties entered into a distributor agreement. Exhibit C.

**19.**

In the distributor agreement, the parties acknowledged that "MGMTL has created and owns certain computer software, applications, and related documentation used for security management administration and report generation, including the Security Management and Reporting Tool (SMART) v1.0, plus derivative works, updates and new releases relating thereto."

**20.**

Pursuant to the distributor agreement, STI was permitted to "advertise, promote, and resell" SMART to "End-Users" (*i.e.*, an individual or entity licensing the SMART software application for his or its own business purposes). Any rights not specifically granted to STI in the distributor agreement were reserved by MGMTL.

**21.**

Foregoing certain opportunities to demonstrate, promote, resell, or license SMART on MGMTL's own and foregoing opportunities for MGMTL to establish relationships with other companies, MGMTL relied on and expected STI to advertise, promote, and resell SMART pursuant to the terms of the parties' agreement.

**22.**

Pursuant to paragraph 3 of the distributor agreement—"MGMTL's Proprietary Rights"—"STI acknowledge[d] and agree[d] that the SMART Software [is] proprietary to MGMTL and that MGMTL retains all right, title, and interest in and to the SMART Software including, without limitation, all copyrights, trademarks, patents, and other proprietary rights of any kind."

**23.**

STI further agreed not to reverse engineer, reverse compile, or otherwise disassemble the SMART software application (except as may be permitted by applicable legislation).

**24.**

STI likewise agreed that it would not remove any copyright notices or proprietary legends contained within the SMART software application.

**25.**

STI further "acknowledge[d] and agree[d] that it shall make no claims to any copyright, trademark, patent, or other proprietary right in or to the SMART Software in the future."

**26.**

The parties agreed that all of the above-cited provisions contained in paragraph 3 of the distributor agreement ("MGMTL's Proprietary Rights") "survive termination of this agreement." Thus, STI remains bound by all provisions contained in this paragraph of the parties' distributor agreement (including, but not limited to, those provisions cited in paragraphs 22-25).

**27.**

The distributor agreement provided that STI would submit to MGMTL for review and approval any end-user license agreement proposed in connection with any government or public agency seeking access to the SMART software application.

**28.**

The distributor agreement was limited in scope. It gave STI permission to "advertise, promote, and resell" SMART. It did not give STI permission to reverse engineer, manipulate, alter, duplicate, change, rename, repackage, and/or hold out the software as if it were STI's own.

**STI terminates its relationship with MGMTL, but STI remains bound by the contractual provisions regarding MGMTL's proprietary rights, including STI's promise in perpetuity <u>not to reverse engineer the SMART software application.</u>**

**29.**

Upon information and belief, STI held a meeting in or about April 2016 with several high-ranking employees of the Marine Forces Reserve (believed to include Steve McMurtry, Ed Maguire, and Donald Washington) at the headquarters in New Orleans, Louisiana.

**30.**

The Marine Forces Reserve officials, who had worked with Menes in the past and who previously had MGMTL's permission to use its SMART software application for free for a limited, trial run basis in the New Orleans office with the expectation of securing a future licensing agreement, were apparently frustrated that STI was working with Menes and that Menes's entity (MGMTL) wanted to charge them for the future use of the SMART software application.

**31.**

After STI's unsuccessful meeting with the Marine Forces Reserve officials, STI refused to communicate with MGMTL and ignored all communications from MGMTL.

**32.**

Finally, in March 2017, STI responded to an email from MGMTL and bluntly informed MGMTL that STI "ha[s] nothing to do with your products/services." Exhibit D.

**33.**

MGMTL responded that it understood that MGMTL and STI still had an exclusive distributor agreement in place. MGMTL stated: "If you are not happy with MGMTL, please send over the proper legal documentation dissolving our exclusive [distributor] relationship; as well as, turn over all UNAUTHORIZED, developed materials/software using our COPYRIGHTED intellectual property and we can go our separate ways."

**34.**

To MGMTL's request regarding termination of the distributor agreement, STI responded: "No other action required." Making clear that the parties' agreement and distributor relationship was over, STI stated: "If any customer wants your services/products, go for it."

**MGMTL learns from others that STI has copied, altered, renamed, and repackaged MGMTL's copyrighted SMART software as STI's own under the name "PASS."**

**35.**

In or around November 2017, Menes was informed by a colleague familiar with the SMART software application, and who worked at the Marine Forces Reserve office in New Orleans, that he had observed STI install security management software at the Marine Forces

9

Reserve office in New Orleans. He believed what he saw was a repackaged or altered version of MGMTL's SMART software.

36.

Menes independently heard about STI's altering, repackaging, and renaming of MGMTL's software when he received an anonymous email dated September 6, 2018, from an individual identified as an "STI employee." The email Menes received stated:

> Jorge – I wanted to inform you how STI is cheating you:
>
> STI took the SMART application that you built and repackaged it as PASS application and sold to MFR [Marine Forces Reserve].
>
> . . .
>
> The PASS application is on 5 standalone machines at the security office at MFR [Marine Forces Reserve]. . . .

37.

"PASS"—like "SMART"—is an acronym. PASS—like SMART—is a security personnel management software. It stands for "Personnel Administrative Security System."

38.

STI's efforts to install, license, and/or sell PASS were not limited to the Marine Forces Reserve Office in New Orleans. PASS is listed on STI's U.S. Government General Services Administration ("GSA") schedule. A GSA schedule is a long-term government-wide contract, which provides federal, state, and local government buyers certain contractual pre-approvals to move forward with licensing or purchasing the PASS application.

39.

The PASS application is actively listed and available for purchase on the GSA's Advantage! Website at a listed purchase price of $214,094.00 per license.

**40.**

Whether purchases or licenses of PASS have resulted and are continuing to result from its inclusion on the GSA schedule and/or whether additional purchases, licenses, installations, or uses of PASS have occurred will be a topic of discovery.

## COUNT ONE – COPYRIGHT INFRINGEMENT

**41.**

MGMTL realleges and incorporates by reference the preceding allegations as if fully set forth in their entirety.

**42.**

MGMTL is the owner of a copyright for the SMART software application and holds a registered copyright. MGMTL is entitled to bring an action for copyright infringement pursuant to 17 U.S.C. § 101 *et seq*.

**43.**

Through prior business dealings and relationships, STI received a copy of the SMART software application package and agreed, among other things, that (a) the SMART software application was proprietary to MGMTL, (b) STI could not reverse engineer or otherwise reverse compile or disassemble the SMART software application, and (c) STI had no rights to any copyright or proprietary right in or to the SMART software application.

**44.**

Upon information and belief, STI has copied or duplicated MGMTL's SMART software, made minor alterations, renamed and repackaged it as PASS, and installed, sold, and/or licensed it—either directly or indirectly—to the Marine Forces Reserve as if it were STI's own. STI did so

without the consent or approval of MGMTL, and STI's actions infringed MGMTL's exclusive rights granted by the Copyright Act, 17 U.S.C. § 106. In so doing, STI acted without authority and outside the scope of any agreement or license the parties might have had.

**45.**

STI knowingly, willingly and deliberately infringed MGMTL's copyright in the SMART software application and, upon information and belief, continues to do so.

**46.**

Upon information and belief, STI entered into a direct or indirect multi-year contract or agreement to provide the Marine Forces Reserve access to PASS, which software may still exist on computer systems at the Marine Forces Reserve office in New Orleans, Louisiana without proper licensing or authorization from MGMTL.

**47.**

By reason of STI's acts of copyright infringement, MGMTL has suffered and will continue to suffer substantial damages in an amount to be proven at trial.

**48.**

Whether STI has otherwise installed PASS, allowed others to utilize PASS, made copies of PASS, provided technical services in connection with PASS, sold PASS, entered into any licensing agreements of PASS, and/or otherwise infringed MGMTL's copyright will be a topic of discovery.

**49.**

Unless restrained and enjoined, STI's acts of copyright infringement have caused and will continue to cause MGMTL irreparable injury.

## COUNT TWO – BREACH OF SOFTWARE EVALUATION AGREEMENT

**50.**

MGMTL realleges and incorporates by reference the preceding allegations as if fully set forth in their entirety.

**51.**

MGMTL and STI entered into a software evaluation agreement, wherein STI acknowledged that the SMART software application was confidential and proprietary; STI agreed not to duplicate the SMART software application, disclose it, or to use it for any purpose other than evaluation; and STI warranted that if a license agreement for the program was not entered into between the parties, STI would remove the SMART software application from all machines, would not retain any copies or backups, and would return all originals and related materials in good condition.

**52.**

STI knowingly and willfully breached the software evaluation agreement by, among other things, retaining the SMART software application, duplicating and altering it, and repackaging it by providing it to third parties. STI is liable for all damages, foreseeable or unforeseeable, caused to MGMTL in an amount to be proven at trial.

## COUNT THREE – BREACH OF DISTRIBUTOR AGREEMENT

**53.**

MGMTL realleges and incorporates by reference the preceding allegations as if fully set forth in their entirety.

54.

MGMTL and STI entered into a distributor agreement wherein STI acknowledged that the SMART software application is proprietary to MGMTL; pledged not to reverse engineer or otherwise disassemble the SMART software application; and agreed that it had no claim to any copyright or proprietary right in the SMART software application. STI agreed that it would remain bound to all of these provisions in perpetuity, even after termination or dissolution of the distributor agreement.

55.

STI knowingly, willfully, intentionally, and in bad faith breached the provisions of the distributor agreement by, among other things, copying, altering, repackaging, licensing and/or selling MGMTL's proprietary software to third parties as if it were STI's own. Any such actions were done without MGMTL's consent or knowledge and without payment of any profits, fees, or royalties to MGMTL. STI is liable for all damages, foreseeable and unforeseeable, including, but not limited to, any lost deals or business opportunities of which MGMTL may have been deprived, in an amount to be proven at trial.

**COUNT FOUR – MISAPPROPRIATION OF TRADE SECRETS**

56.

MGMTL realleges and incorporates by reference the preceding allegations as if fully set forth in their entirety.

57.

MGMTL's SMART software application (and its underlying data and coding) derive independent economic value, in part, from the fact that its contents and capabilities are not

generally known by persons unfamiliar with it and those contents and capabilities are not readily ascertainable by others because of the context in which it was developed and because it has not been available on the open market or elsewhere.

**58.**

MGMTL's SMART software application has been the subject of reasonable efforts to maintain its secrecy: (1) it was developed and refined on Menes's personal computer to which others did not have access; (2) MGMTL allowed it to be utilized in the Marine Forces Reserve office in New Orleans, Louisiana only on a limited, trial basis, after which point, the software expired and became inoperable; (3) STI was initially granted only temporary access to it in accordance with the software evaluation agreement in which STI acknowledged that the SMART software application contained confidential and proprietary information, and STI agreed to maintain the application in confidence to the same extent that STI maintains confidentiality to protect its own proprietary information; and (4) pursuant to the distributor agreement, STI acknowledged and agreed that the SMART software application was proprietary to MGMTL and that MGMTL retained all right, title, and interest in and to the SMART software application including, without limitation, all copyrights, trademarks, patents, and other proprietary rights of any kind, and STI agreed not to reverse engineer, reverse compile, or otherwise disassemble the SMART software application.

**59.**

STI received access to MGMTL's SMART software because STI entered into agreements wherein STI acknowledged MGMTL's proprietary rights, represented that it would maintain the software in confidence, and promised not to reverse engineer or disassemble the software.

**60.**

STI's ability to use the SMART software was limited. During the period of the parties' distributor relationship, STI was authorized to advertise, promote, and resell SMART. STI was not authorized to disclose or use SMART in any other form or manner.

**61.**

STI misappropriated MGMTL's SMART software application without MGMTL's implied or express consent. STI acted with full knowledge that MGMTL derived economic value from SMART's unique content and capabilities, which is the first of its kind and is available nowhere else, with full knowledge of MGMTL's reasonable efforts to protect the secrecy of this unique application, and with full knowledge of STI's legal duty to protect the secrecy of the SMART software application and limit it use or disclosure.

### PRAYER FOR RELIEF AND JURY DEMAND

WHEREFORE, plaintiff MGMTL, LLC requests a trial by jury and prays for judgment against defendant Strategic Technology Institute, Inc. as follows:

A. For an injunction permanently enjoining and restraining STI, its officers, directors, agents, employees, representatives, and all persons acting in concert with them from infringing MGMTL's copyrighted works, impounding all such infringing property, and requiring STI to (a) remove all infringing works from any and all machines on which it is stored and to surrender any copies or backups of the infringing software application to MGMTL; and (b) cease engaging in further acts constituting copyright infringement, breach of contract, and/or trade secret misappropriation;

B. For an order requiring STI to account for and disgorge to MGMTL all gains, profits, and advantages derived by its copyright infringement pursuant to 17 U.S.C. § 504(b);

C. For an award of MGMTL's actual damages for STI's copyright infringement pursuant to 17 U.S.C. § 504(b);

D. For an award of statutory damages against STI in the maximum amount permitted by law pursuant to 17 U.S.C. § 504(c);

E. For an award of statutory damages due to STI's willful infringement pursuant to 17 U.S.C. § 504(c)(2);

F. For an award of MGMTL's damages for STI's breaches of contract, including all damages that were foreseeable or unforeseeable;

G. For an award of MGMTL's damages for STI's misappropriation of its trade secrets;

H. For an award of MGMTL's costs, including reasonable attorney's fees, pursuant to 17 U.S.C. § 505 and pursuant to La. R.S. §51:1434;

I. For an award of pre-judgment and post-judgment interest on all applicable amounts; and

J. For any and all other legal or equitable relief to which MGMTL may be entitled.

Respectfully submitted,

/s/ Camille E. Gauthier
Thomas M. Flanagan (#19569)
Harold J. Flanagan (#24091)
Camille E. Gauthier (#34558)
Dennis O. Durocher, Jr. (#36441)
FLANAGAN PARTNERS LLP
201 St. Charles Ave. Suite 3300
New Orleans, Louisiana 70170
Telephone: (504) 569-0235
Facsimile: (504) 529-0251
tflanagan@flanaganpartners.com
cgauthier@flanaganpartners.com
hflanagan@flanaganpartners.com
ddurocher@flanaganpartners.com