# UNITED STATES DISTRICT COURT

# EASTERN DISTRICT OF LOUISIANA

**MGMTL, LLC**                                    **CIVIL ACTION**

**VERSUS**                                        **NO. 20-2138-WBV-MBN**

**STRATEGIC TECHNOLOGY**                          **SECTION: D (5)**

## ORDER AND REASONS

Before the Court is Defendant's Motion *in Limine* to Preclude Opinion Testimony of Jorge Menes.[1]  MGMTL, LLC oppose the Motion,[2] and Defendant has filed a Reply.[3]

After careful consideration of the parties' memoranda and the applicable law, the Motion is **GRANTED in part and DENIED in part.**

## I.    FACTUAL AND PROCEDURAL BACKGROUND

This is copyright infringement case concerning a computer software application.  On July 28, 2020, MGMTL, LLC ("MGMTL") filed a Complaint in this Court, seeking a permanent injunction against, and damages from, Strategic Technology Institute, Inc. ("STI") for copyright infringement, breach of contract, and

---

[1] R. Doc. 91.

[2] R. Doc. 99-7, filed into the record under seal.  MGMTL moved for leave to file under seal its Opposition brief and several exhibits thereto "[o]ut of an abundance of caution" and on the basis that, "STI has taken an expansive approach with respect to the parties' protective order and has designated all documents it has produced in discovery in this litigation as 'confidential' pursuant to the protective order (Rec. Doc. 39)."  R. Doc. 100.  The Court granted that request.  R. Doc. 105.

[3] R. Doc. 121, filed into the record under seal.  The Court granted STI's request to file the Reply brief and two exhibits thereto into the record under seal on the basis that the Reply brief discusses "information contained within the above exhibits and other documents that have been designated as 'confidential' under the Court's general Protective Order."  *See*, R. Docs. 112 & 121.

misappropriation of trade secrets.[4]  With the Court's consent, MGMTL subsequently filed an Amended and Restated Complaint (the "Amended Complaint") to clarify and revise certain allegations.[5]

MGMTL alleges that in 1998, Jorge Menes, a full-time college student, started teaching himself software coding and began creating a security management database at home in his spare time.[6]  MGMTL alleges that Menes and his business partner, Whit Himel, created MGMTL and transferred their ownership of the security database and its intellectual property to MGMTL.[7]  MGMTL alleges that the security database was refined over time with the help of Himel, and eventually evolved into the Security Management and Reporting Tool ("SMART"), a "computer software application designed to streamline and efficiently manage the complex tasks and requirements of United States Department of Defense security managers, government contracting companies, and other industries for which the management of personnel and their security clearance is a priority."[8]  MGMTL alleges that the SMART software application is an extremely valuable tool and the first of its kind, capable of evaluating thousands of personnel records while applying Department of Defense rules, regulations, and applicable security clearance guidelines to each one.[9]  MGMTL asserts that it obtained a registered copyright for "the SMART Security Management and Reporting Tool" on September 27, 2013.[10]  MGMTL asserts that it

---

[4] R. Doc. 1.
[5] R. Docs. 19, 21, & 22.
[6] R. Doc. 22 at ¶ 6.
[7] *Id.* at ¶ 7.
[8] *Id.* at ¶¶ 2 & 8.
[9] *Id.* at ¶ 9.
[10] *Id.* at ¶ 11.

had previously granted the New Orleans office of the Marine Forces Reserve (sometimes referred to by the parties as "MARFORRES"),[11] a unit of the United States Marine Corps, limited permission to use its SMART software application on a trial basis.[12]  MGMTL does not specify when this occurred.

MGMTL alleges that on May 27, 2015, it entered into a software evaluation agreement with STI, whereby MGMTL granted STI temporary access to the SMART software application to evaluate it for the possibility of long-term licensing.[13] MGMTL asserts that, due to STI's experience and presence in the realm of government contracting, MGMTL was considering the possibility of STI providing distribution, marketing, and other support services to MGMTL regarding SMART.[14] According to MGMTL, STI received a copy of the SMART software application and was authorized to install and evaluate it for a 30-day period, during which STI agreed to maintain the confidentiality of the application and to not duplicate the application or disclose it to anyone outside of STI.[15]  MGMTL alleges that soon after executing the software evaluation agreement, the parties entered into a distributor agreement, through which STI was permitted to advertise, promote, and resell SMART to end-users.[16]  MGMTL asserts that the distributor agreement included an acknowledgment by STI that SMART is "proprietary to MGMTL and that MGMTL retains all right, title, and interest in and to the SMART Software including, without

---

[11] R. Doc. 91-1 at p. 4; R. Doc. 99-27; R. Doc. 99-6 at p. 25.
[12] R. Doc. 22 at ¶ 12.
[13] *Id*. at ¶ 15.
[14] *Id*. at ¶ 14.
[15] *Id*. at ¶ 16.
[16] *Id*. at ¶¶ 19 & 20.

limitation, all copyrights, trademarks, patents, and other proprietary rights of any kind."[17]  MGMTL further alleges that the agreement did not give STI the right to reverse engineer, reverse compile, duplicate, rename, repackage or otherwise disassemble the SMART software application, as may be permitted by applicable legislation.[18]  MGMTL asserts that the parties agreed that all of the foregoing provisions of the distributor agreement would survive termination of the agreement, such that STI remains bound by the provisions.[19]

MGMTL further alleges that STI held a meeting in or about April 2016 with several high-ranking employees of the Marine Forces Reserve at the headquarters in New Orleans, Louisiana to discuss SMART.  MGMTL claims that the Marine Forces Reserve officials, who previously had MGMTL's permission to use the SMART software application for free for a limited, trial-run basis in the New Orleans office, "were apparently frustrated that STI was working with Menes and that Menes's entity (MGMTL) wanted to charge them for the future use of the SMART software application."[20]  MGMTL asserts that, after this unsuccessful meeting, STI refused to communicate with MGMTL and ignored all communications from MGMTL until March 2017, when STI responded to an MGMTL email and stated that STI "ha[s] nothing to do with your products/services."[21]

---

[17] *Id*. at ¶ 22 (internal quotation marks omitted).
[18] *Id*. at ¶ 23.
[19] *Id*. at ¶ 26.
[20] *Id*. at ¶ 30.
[21] *Id*. at ¶ 32 (*quoting* R. Doc. 22-4 at p. 2) (internal quotation marks omitted).

MGMTL then alleges that in or around November 2017, a colleague who worked at the Marine Forces Reserve office in New Orleans informed Menes that he had observed STI install security management software at the New Orleans office, which he believed was a repackaged or altered version of SMART.[22]  MGMTL asserts that Menes also received an anonymous email dated September 6, 2018 from someone identified as an "STI employee," stating that STI had repackaged the SMART software application as an application called Personnel Administrative Security System, or "PASS," which STI then sold to the Marine Forces Reserve and installed on five machines at the Marine Forces Reserve office in New Orleans.[23]  MGMTL alleges that PASS is listed on STI's United States Government General Services Administration ("GSA") Schedule, which is a long-term government-wide contract that provides federal, state, and local government buyers certain contractual pre-approvals to move forward with licensing or purchasing the PASS application.[24] According to MGMTL, the PASS application is actively listed and available for purchase on GSA's Advantage! Website at a purchase price of $214,094.00 per license.[25]  MGMTL filed this lawsuit after learning of these actions allegedly taken by STI.

On May 10, 2021, STI filed the instant Motion in Limine, seeking to preclude, under Fed. R. Evid. 701 and 702, the opinion testimony of Menes at trial on any

---

[22] R. Doc. 22 at ¶ 35.
[23] *Id*. at ¶ 36.
[24] *Id*. at ¶ 38.
[25] *Id*. at ¶ 39.

matters relating to damages.[26]   Specifically, STI seeks to preclude Menes from offering opinion testimony regarding the fair market value or reasonable licensing fee of the SMART software application, as set forth in the Summary of Opinion Testimony of Jorge Menes, dated January 28, 2021 (the "Summary Opinion").[27]  STI asserts that the Summary Opinion states that Menes estimates the fair market value or reasonable exclusive licensing fee for all rights to SMART "for a period of five years as $7,650,00 as a minimum and likely $89,870,000."[28]  STI claims that Menes's testimony is inadmissible under Rule 702 because he is not qualified to testify as an expert regarding the fair market value or reasonable licensing fees for software, and because his opinions are not reliable.[29]  STI further asserts that Menes's testimony should be excluded under Rule 701  because it does not satisfy the requirements for lay opinion testimony.[30]

MGMTL opposes the Motion, asserting that Menes is an experience-based expert in security management and is qualified to address the issue of damages under the less rigid approach taken by *Daubert* toward such experts.[31]  MGMTL asserts that Menes's knowledge, skill, experience, training, and education qualify him to offer opinion testimony on the issue of damages because he played a significant role in the development of SMART, he established a price point for it, and he can testify that it was met with acceptance in negotiations for sale of a license to the Marine Forces

---

[26] R. Doc. 91.
[27] *Id.*; *See*, R. Doc. 91-2.
[28] R. Doc. 91-1 at p. 1 (*quoting* R. Doc. 91-2) (internal quotation marks omitted).
[29] R. Doc. 91-1 at pp. 2 & 3-11.
[30] R. Doc. 99-27 at pp. 11-12.
[31] *Id.* at pp. 1 & 2-4, 7-8, & 9-10.

Reserve.[32]   MGMTL argues that Menes's opinion valuing a one-year license of SMART at $30,000 is not speculative because MGMTL sold a SMART license to the Marine Forces Reserve and, therefore, MGMTL has experience in licensing SMART.[33] In a footnote, however, MGMTL notes that, "Due to sequestration, the money was never actually paid; but a sale was made nevertheless."[34]   MGMTL then explains that Menes arrived at his calculation of $7,650,000 by multiplying the one-year, $30,000 license "by a conservative estimate of licenses Menes knew were doable and realistic," meaning the 51 units within the Marine Forces Reserve, and multiplying that number by five years, which is "the period of time during which STI has taken unrestricted access to [SMART]."[35]   MGMTL contends that this is "simply a baseline as to what would have been required to give up unrestricted rights to SMART."[36] MGMTL asserts that Menes's testimony will be corroborated by the testimony of other witnesses, and that it should be considered in that context rather than in isolation.[37]   Finally, MGMTL asserts that, at a minimum, Menes should be allowed to offer lay opinion testimony under Rule 701 regarding his personal time and expense in creating SMART and to explain that MGMTL would not have given STI unrestricted rights to SMART without being compensated for its labor and time.[38]

In response, STI maintains that Menes's testimony regarding the fair market value or reasonable exclusive licensing fee for SMART should be excluded because he

---

[32] *Id.* at pp. 13-14.
[33] *Id.* at p. 17.
[34] *Id.* at n.56 (citations omitted).
[35] *Id.* at p. 19.
[36] *Id.*
[37] *Id.* at pp. 21-22.
[38] *Id.* at pp. 23-24.

is not qualified to give expert testimony on that topic, his opinions are unreliable, and his opinions are based upon insufficient information.[39]  STI contends that the Court should preclude Menes's testimony because Menes testified during his deposition that he picked $30,000 as the starting point for his calculations because it was the "threshold of what could be charged on a government charge card."[40]  STI urges the Court to disregard the new Declaration from Menes, submitted with the Opposition brief, in which he states that the $30,000 figure was based on cost savings to the government, because it is a sham-affidavit that contradicts his deposition testimony.[41]  STI argues that such supplemental expert reports cannot be used to fix problems in initial reports.[42]  STI points out that while MGMTL claims that it sold a SMART license to the Marine Forces Reserve through a "signed bailment agreement," the Marine Forces Reserve never executed the bailment agreement.[43]  MGMTL maintains that Menes should not be allowed to offer lay opinion testimony regarding a reasonable royalty or licensing fee, and argues the cases relied upon by MGMTL are distinguishable.[44]  Finally, STI asserts that MGMTL seems to have abandoned any defense of Menes's calculation of damages above $7,650,000 because it did not defend Menes's higher calculation of $89,870,000 in its Opposition brief.[45]

---

[39] R. Doc. 121.

[40] *Id.* at p. 1 (*quoting* R. Doc. 91-1 at pp. 6-7) (internal quotation marks omitted).

[41] R. Doc. 121 at pp. 2-3.

[42] *Id.* at p. 2 (citing authority).

[43] *Id* at p. 8 (*citing* R. Docs. 121-3 & 121-4).

[44] R. Doc. 121 at pp. 9-10 (citing *LaCombe v. A-T-O, Inc.*, 679 F.2d 431, 433 (5th Cir. 1982); *King v. Ames*, 179 F.3d 370 (5th Cir. 1999)).

[45] R. Doc. 121 at p. 10.  STI notes in a footnote in its Reply brief that, "Menes could never quite get his math to add up to $89,870.000 during his deposition."  R. Doc. 121 at p.1, fn 1.  The Court notes that this appears to be a typographical error, as STI likely intended to reference Menes's higher estimate of $89,870,000.

## II.    LEGAL STANDARD

Federal Rule of Civil Procedure 26(a)(2)(A) requires parties to "disclose to the other parties the identity of any witness it may use at trial to present evidence under Federal Rule of Evidence 702, 703, or 705."[46]   Rule 26 distinguishes between witnesses who are retained or specially employed to give expert testimony and those who are not retained or specially employed, but who may nonetheless testify as a fact witness and also provide expert testimony.[47]   According to Rule 26(a)(2)(B), if a witness "is one retained or specially employed to provide expert testimony in the case or one whose duties as the party's employee regularly involve giving expert testimony," the witness must provide an expert report.   Rule 26(a)(2)(C), entitled "Witnesses Who Do Not Provide a Written Report," provides the following:

> Unless otherwise stipulated or ordered by the Court, if the witness is not required to provide a written report, this disclosure must state:
>
>> (i) the subject matter on which the witness is expected to present evidence under Fed. R. Evid. 702, 703, or 705; and
>> (ii) a summary of the facts and opinions to which the witness is expected to testify.[48]

As previously explained by this Court, "Rule 26(a)(2)(C) was added to 'mandate summary disclosures of the opinions to be offered by expert witnesses who

---

[46] Fed. R. Civ. P. 26(a)(2)(A).

[47] Fed. R. Civ. P. 26, Advisory Committee Notes to 2010 Amendments; *Tajonera v. Black Elk Energy Offshore Operations, LLC*, Civ. A. No. 13-0366 c/w 13-0550, 13-5137, 13-2496, 13-5508, 13-6413, 14-374, 14-1714, 2016 WL 3180776, at *7 (E.D. La. June 7, 2016) (Brown, J.) (citing *Rea v. Wis. Coach Lines, Inc.*, Civ. A. No. 12-1252, 2014 WL 4981803, at *2 (E.D. La. Oct. 3, 2014) (Duval, J.)).

[48] Fed. R. Civ. P. 26(a)(2)(C).

are not required to provide reports under Rule 26(a)(2)(B) and of the facts supporting those opinions.'"[49]

As explained by other courts in this Circuit, "The distinction between retained and non-retained experts should be interpreted in a common sense manner."[50] "While a retained expert is recruited to provide expert testimony without any prior, personal knowledge of the facts giving rise to litigation, a non-retained expert's testimony 'arises not from his enlistment as an expert, but, rather, from his ground-level involvement in the events giving rise to the litigation.'"[51] Often referred to in this Circuit as a "hybrid fact/expert witness," a non-retained expert under Rule 26(a)(2)(C) is typically limited to testifying about his opinions formed as a result of his knowledge of the case gained through direct observation.[52] Stated another way, a hybrid witness can testify as "an actor with regard to the occurrences from which the tapestry of the lawsuit was woven."[53] "While non-retained experts may be asked questions that implicate their expertise, they cannot be asked to opine about broader

---

[49] *Tajonera*, Civ. A. No. 13-0366, 2016 WL 3180776 at *7 (*quoting* Fed. R. Evid. 26(a)(2)(C), Advisory Committee Notes to 2010 Amendments). The Court notes that the *Tajonera* court's reference to Fed. R. Evid. 26(a)(2)(C) appears to be a typographical error and an intended reference to Fed. R. Civ. P. 26(a)(2)(C).

[50] *Ferrara Land Management Mississippi, LLC v. Landmark American Insur. Co.*, Civ. A. No. 1:19cv956-HSO-JCG, 2021 WL 4819461, at *2 (S.D. Miss. July 19, 2021) (Ozerden, J.) (quoting *DiSalvatore v. Foretravel, Inc.*, Civ. A. No. 9:14-CV-00150-KFG, 2016 WL 7742996, at *2 (E.D. Tex. May 20, 2016) (Giblin, M.J.)) (internal quotation marks omitted); *See also, Cooper v. Meritor, Inc.*, Civ. A. No. 4:16-CV-52-DMB-JMV, 2018 WL 1513006, at *2 (N.D. Miss. Mar. 27, 2018) (Virden, M.J.); *Meier v. UHS of Delaware, Inc.*, Civ. A. No. 4:18-CV-00615, 2020 WL 923952, at *8 (E.D. Tex. Feb. 26, 2020) (Mazzant, J.).

[51] *Ferrara*, Civ. A. No. 1:19cv956-HSO-JCG, 2021 WL 4819461 at *2 (quoting *DiSalvatore*, Civ. A. No. 9:14-CV-00150-KFG, 2016 WL 7742996 at *2). *See, United States ex rel. Rigsby v. State Farm Fire & Cas. Co.*, Civ. A. No. 1:06CV433-HSO-RHW, 2019 WL 6792774, at *2 (S.D. Miss. Dec. 12, 2019) (Walker, M.J.).

[52] *Ferrara*, Civ. A. No. 1:19cv956-HSO-JCG, 2021 WL 4819461 at *2 (citing *DiSalvatore*, Civ. A. No. 9:14-CV-00150-KFG, 2016 WL 7742996 at *2).

[53] *Tajonera,* Civ. A. No. 13-0366, 2016 WL 3180776 at *9 (quoting *LaShip, LLC v. Hayward Baker, Inc.*, 296 F.R.D. 475, 480 n.34 (E.D. La. 2013) (Brown, J.)) (internal quotation marks omitted).

issues beyond their own personal involvement unless they also submit written expert reports."[54]  Thus, the scope of a non-retained expert's testimony is limited to expert opinions based upon her personal knowledge and observations.[55]

Regardless of whether a witness is proffered as a retained expert or as a non-retained expert, the witness must still satisfy the requirements of *Daubert v. Merrell Dow Pharmaceuticals, Inc.*[56] and Fed. R. Evid. 702.[57]  "Thus, although *Daubert* and its progeny often discuss specially retained experts, Rule 26(a)(2)(C) experts who provide expert opinions pursuant to Rule 702 may also be challenged under *Daubert*."[58]  The district court has considerable discretion to admit or exclude expert testimony under Fed. R. Evid. 702,[59] and the burden rests with the party seeking to present the testimony to show that the requirements of Rule 702 are met.[60]  Rule 702 provides that an expert witness "qualified . . . by knowledge, skill, experience, training or education may testify in the form of an opinion" when all of the following

---

[54] *Ferrara*, Civ. A. No. 1:19cv956-HSO-JCG, 2021 WL 4819461 at *2 (citing *DiSalvatore,* Civ. A. No. 9:14-CV-00150-KFG, 2016 WL 7742996 at *2); *See, Spears v. United States*, Civ. A. No. 5:13-CV-47-DAE, 2014 WL 258766, at *8 (W.D. Tex. Jan. 23, 2014) (Ezra, J.) (*citing* Fed. R. Civ. P. 26(a)(2)(B) and 26(e)).

[55] *Ferrara*, Civ. A. No. 1:19cv956-HSO-JCG, 2021 WL 4819461 at *2 (quoting *StoneCoat of Texas, LLC v. Procal Stone Design, LLC*, Civ. A. No. 4:17CV303, 2019 WL 9899919, at *15 (E.D. Tex. June 28, 2019) (Craven, M.J.)).

[56] 509 U.S. 579, 113 S.Ct. 2786, 125 L.Ed.2d 469 (1993).

[57] *Ferrara*, Civ. A. No. 1:19cv956-HSO-JCG, 2021 WL 4819461 at *3 (citing *Collett v. Weherhaeuser Co.*, Civ. A. No. 19-11144, 2021 WL 76396, at *3 (E.D. La. Jan. 8, 2021) (Fallon, J.); *Tajonera*, Civ. A. No. 13-0366, 2016 WL 3180776, at *7).

[58] *Tajonera*, Civ. A. No. 13-0366, 2016 WL 3180776 at *7 (citing authority).

[59] *See, Gen. Elec. Co. v. Joiner*, 522 U.S. 136, 138-39, 118 S.Ct. 512, 139 L.Ed.2d 508 (1997); *Seatrax, Inc. v. Sonbeck Int'l, Inc.*, 200 F.3d 358, 371 (5th Cir. 2000); *Tajonera*, Civ. A. No. 13-0366, 2016 WL 3180776 at *8 (citing authority).

[60] *Moore v. Ashland Chemical Inc.*, 151 F.3d 269, 276 (5th Cir. 1998).

requirements are met:

> (a) The expert's scientific, technical, or other specialized knowledge will help the trier of fact to understand the evidence or to determine a fact in issue;
>
> (b) The testimony is based on sufficient facts or data;
>
> (c) The testimony is the product of reliable principles and methods; and
>
> (d) The expert has reliably applied the principles and methods to the facts of the case.[61]

Rule 702 codifies the Supreme Court's opinion in *Daubert*, which charges district courts to act as "gatekeepers" when determining the admissibility of expert testimony.[62] "To be admissible under Rule 702, the court must find that the evidence is both relevant and reliable."[63] According to the Fifth Circuit, reliability is determined by assessing whether the reasoning or methodology underlying the testimony is scientifically valid, while relevance depends on whether the reasoning or methodology underlying the testimony can be properly applied to the facts at issue.[64] The purpose of the reliability requirement is to exclude expert testimony based merely on subjective belief or unsupported speculation.[65]

## III.   ANALYSIS

### A.  Menes is a Non-Retained Expert Under Fed. R. Civ. P. 26(a)(2)(C)

At the outset, the Court notes that while both parties refer to Menes as an "expert" in their briefs, neither party has addressed, much less mentioned, whether

---

[61] Fed. R. Evid. 702; *Tajonera*, Civ. A. No. 13-0366, 2016 WL 3180776 at *8.

[62] *United States v. Fullwood*, 342 F.3d 409, 412 (5th Cir. 2003) (citing *Daubert v. Merrell Dow Pharmaceuticals, Inc.*, 509 U.S. 579, 113 S.Ct. 2786, 125 L.Ed.2d 469 (1993)).

[63] *United States v. Ebron*, 683 F.3d 105, 139 (5th Cir. 2012) (citing *United States v. Valencia*, 600 F.3d 389, 423 (5th Cir. 2010)).

[64] *Ebron*, 683 F.3d at 139 (citing *Pipitone v. Biomatrix, Inc.*, 288 F.3d 239, 244 (5th Cir. 2002)).

[65] *Tajonera*, Civ. A. No. 13-0366, 2016 WL 3180776 at *8 (citing *Daubert*, 509 U.S. at 590, 113 S.Ct. at 2795).

Menes is a retained expert under Fed. R. Civ. P. 26(a)(2)(B) or a non-retained expert under Fed. R. Civ. P. 26(a)(2)(C).  Nonetheless, there is no evidence before the Court indicating that Menes was specially retained or employed by MGMTL to provide expert testimony in the case, or that his duties as a "majority member/manager of MGMTL"[66] "regularly involve giving expert testimony."[67]  Instead, the evidence before the Court reveals that Menes is the co-creator of the SMART software application at issue in this case.  As such, it seems that Menes's opinion testimony "arises not from his enlistment as an expert but, rather, from his ground-level involvement in the events giving rise to the litigation."[68]  Further, STI does not raise any objection to Menes's failure to provide a written report.  Thus, Menes appears to be a non-retained expert under Rule 26(a)(2)(C).  Additionally, Menes's Summary Opinion appears to be a Rule 26(a)(2)(C) disclosure for a non-retained witness.  The Court reaches this conclusion based upon both the information contained in the Summary Opinion and the fact that it is dated January 28, 2021, the Court' imposed deadline for MGMTL's "expert disclosures, as defined by the Federal Rules of Civil Procedure 26(a)(2)(C)."[69]

As a non-retained expert under Rule 26(a)(2)(C), Menes is exempt from the Rule 26(a)(2)(B) reporting requirements insofar as his testimony may be related to his personal involvement in the events that gave rise to this litigation.  That personal

---

[66] R. Doc. 99-5 at p. 1.
[67] Fed. R. Civ. P. 26(a)(2)(B).
[68] *Tajonera*, Civ. A. No. 13-0366, 2016 WL 3180776 at *9 (quoting *LaShip, LLC v. Hayward Baker, Inc.*, 296 F.R.D. 475, 480 n.34 (E.D. La. 2013)) (internal quotation marks omitted).
[69] R. Doc. 44.

involvement includes his observations and opinions regarding his creation of the SMART software application, his personal involvement in MGMTL's discussions with individuals at the Marine Forces Reserve office in New Orleans, Louisiana regarding licensing the SMART software application, and his personal involvement in MGMTL's negotiations with STI to market and sell the SMART software application.[70]  Any opinion testimony offered by Menes on these issues clearly fall within the purview of Rule 26(a)(2)(C).

Menes's expert testimony, however, will be allowed only as to facts and opinions that were not produced specifically in preparation for the trial of this matter.[71]  As previously explained by this Court, this approach comports with "the plain language of Rule 26(a)(2)(B), which clearly contemplates that some employees who render expert opinions should be exempt from the reporting requirement, but would limit the exception to 'experts who are testifying as fact witnesses, although they may also express some expert opinions.'"[72]  If, however, Menes is called to offer expert testimony that extends beyond "his ground-level involvement in the events giving rise to the litigation,"[73] and strays into opinions that he developed in preparation for this litigation, Menes must comply with the Rule 26(a)(2)(B) reporting requirements, regardless of his status as a non-retained expert.[74]

---

[70] *Beechgrove Redevelopment, LLC v. Carter & Sons Plumbing, Heating, and Air-Conditioning, Inc.*, Civ. A. No. 07-8446, 2009 WL 981724, at *6 (E.D. La. Apr. 9, 2009) (Barbier, J.).

[71] *Id.*

[72] *Id.* (quoting *Day v. Consol. Rail Corp.*, Civ. A. No. 95 CIV. 968 (PKL), 1996 WL 257654, at *2 (S.D.N.Y. May 15,1996) (Dolinger, M.J.)) (emphasis added by *Beechgrove*).

[73] *Tajonera*, Civ. A. No. 13-0366, 2016 WL 3180776 at *9 (quoting *LaShip, LLC v. Hayward Baker, Inc.*, 296 F.R.D. 475, 480 n.34 (E.D. La. 2013)) (internal quotation marks omitted).

[74] *Beechgrove Redevelopment, LLC*, Civ. A. No. 07-8446, 2009 WL 981724 at *6 (quoting *Day*, Civ. A. No. 95 CIV. 968 (PKL), 1996 WL 257654 at *2) (quotation marks omitted); *See*, *Lee v. Valdez*, Civ. A.

### B. The Opinion Testimony At Issue in STI's Motion.

At the outset, the Court notes that in the instant Motion, STI requests "an Order to preclude the opinion testimony of Jorge Menes at trial on *any matters related to damages* (including regarding fair market value or a reasonable licensing fee) as disclosed in the Summary of Opinion Testimony of Jorge Menes dated January 28, 2021."[75] STI's Supporting Memorandum, however, is devoted exclusively to excluding Menes's opinion testimony regarding the fair market value or reasonable licensing fee of the SMART software application.[76] As such, the Court's review of STI's Motion is limited to STI's request for the Court to exclude Menes's opinion testimony regarding the fair market value or reasonable licensing fee for the SMART software application, as set forth in Menes's Summary Opinion.[77] The Court must therefore determine whether Menes's testimony regarding the fair market value or

No. 3:07-CV-1298-D, 2008 WL 4287730 (N.D. Tex. Sept. 18, 2008) (Fitzwater, C.J.) (excluding defendant sheriff's expert treating physicians in action for wrongful death of inmate based on failure to produce Rule 26 expert reports, despite argument that physicians were exempt as employees of defendant); *Prieto v. Malgor*, 361 F.3d 1313, 1318-19 (11th Cir. 2004) (finding that an expert report was required regarding the testimony of an employee proffered as an expert in use of force and police procedures).

[75] R. Doc. 91 at p. 1 (emphasis added).

[76] R. Doc. 91-1 at pp. 1-2, 3, 4-5, & 6-11.

[77] Although not raised by STI, the Court questions whether the Summary Opinion meets the disclosure requirements of Fed. R. Civ. P. 26(a)(2)(C). As noted by another Section of this Court, "[W]hile courts 'must take care against requiring undue detail' in Rule 26(a)(2)(C) disclosures, Adv. Comm. Notes to 2010 Amendments, the 'summary' disclosure should at the very least an [sic] 'abstract, abridgement, or compendium' of the opinion *and* facts supporting the opinion." *Rea v. Wisconsin Coach Lines, Inc.*, Civ. A. No. 12-1252, 2014 WL 4981803, at *5 (E.D. La. Oct. 3, 2014) (Duval, J.) (quotation omitted) (emphasis in original). The Summary Opinion does not specify the facts upon which Menes based his valuation of the SMART license. Instead, the Summary Opinion states that, "With respect to these opinions, Menes will testify as a fact witness to establish the fair market value or reasonable licensing fee of SMART based on real world facts and knowledge of the target industry and the current state of information technology." R. Doc. 91-2 at p. 3. However, because STI has not raised this as a basis upon which to exclude Menes's opinion testimony, the Court need not answer this question in this Order.

reasonable licensing fee of SMART satisfies the relevancy and reliability requirements of *Daubert* and Fed. R. Evid. 702.[78]

### C. MGMTL Has Failed to Show That Menes is Qualified to Offer Opinion Testimony Regarding the Fair Market Value or Reasonable Exclusive Licensing Fee For SMART.

On the question of whether Menes is qualified to offer opinion testimony regarding the fair market value or reasonable licensing fee of SMART, the parties' arguments are brief.  STI argues that Menes has no professional background, experience, training, or education in valuation or software licensing, and points out that no qualifications are listed in the Summary Opinion.[79]  Relying upon Menes's deposition testimony, STI further asserts that neither Menes nor MGMTL have ever sold a software license, that Menes has never served as an expert, that Menes has never been paid for his time to provide an expert opinion, and that Menes has never been paid to calculate a reasonable licensing fee for software.[80]  STI also points out that Menes admitted that he is not an expert in software, "but simply claims to understand economics."[81]

MGMTL asserts that it seeks to recover its actual damages from STI's alleged copyright infringement and trade secret misappropriation, and that "actual damages" are based on a reasonable licensing fee, or the "fair market value of the copyright."[82]

---

[78] *Ferrara Land Management Mississippi, LLC v. Landmark American Insur. Co.*, Civ. A. No. 1:19cv956-HSO-JCG, 2021 WL 4819461, at *2-3 (S.D. Miss. July 19, 2021); *Tajonera*, Civ. A. No. 13-0366, 2016 WL 3180776 at *7-9; *Beechgrove Redevelopment, LLC*, Civ. A. No. 07-8446, 2009 WL 981724 at *5-7.

[79] R. Doc. 91-1 at p. 3 (*citing* R. Doc 91-2).

[80] R. Doc. 91-1 at pp. 3-4 (*citing* R. Doc. 91-3 at pp. 2, 14, & 42).

[81] R. Doc. 91-1 at p. 4 (*citing* R. Doc. 91-3 at p. 16).

[82] R. Doc. 99-27 at pp. 10-11 (quoting *Ghirmay v. Tsegia*, Civ. A. No. 07-1826, 2009 WL 2488185, at *3 (E.D. La. Aug. 10, 2009) (Berrigan, J.)) (internal quotation marks omitted).

MGMTL contends that for intellectual property damages, the Fifth Circuit applies a "flexible and imaginative approach to the problem of damages," which is controlled by the facts particular to the case.[83]  Relying upon this framework and the Fifth Circuit's decision in *University Computing Co. v. Lykes-Youngstown Corp.*, MGMTL asserts that Menes is qualified to testify regarding the fair market value of an unrestricted license to SMART because he played a significant role in the development of SMART, he established the price point for it and can testify that it was met with acceptance in negotiations for sale of a license to MARFORRES, and he served as a technical expert at sales presentations of SMART.[84]  MGMTL further asserts that, as the co-creator of SMART, Menes has the personal knowledge to speak about development costs, the field-testing SMART underwent, "and other extrinsic factors such as the need for SMART and the highly specialized security management knowledge required to build SMART – specialized knowledge that goes beyond software valuation and deep into various Department of Defense regulations and general principles of security management."[85]  MGMTL contends that Menes's knowledge, skill, and experience as manager of MGMTL, as a security management specialist, and as the co-creator of SMART make him uniquely qualified to testify regarding these issues.

The Court agrees with STI that MGMTL has failed to establish that Menes is qualified to offer an expert opinion regarding the "fair market value or reasonable

---

[83] R. Doc. 99-27 at p. 11 (quoting *University Computing Co. v. Lykes-Youngstown Corp.*, 504 F.2d 518, 538 (5th Cir. 1974)) (internal quotation marks omitted).
[84] R. Doc. 99-27 at p. 14 (citing *Univ. Computing Co.*, 504 F.2d at 543).
[85] R. Doc. 99-27 at p. 14.

exclusive licensing fee for all rights to SMART (including the ability to sell a copy or derivative of SMART through a Government Services Agency contract) for a period of five years as $7,650,000 as a minimum and likely $89,870,000."[86]   While there is evidence before the Court indicating that Menes has experience in the field of security management,[87] which STI does not appear to dispute,[88] that experience does not automatically qualify him to provide expert testimony regarding the fair market value or reasonable exclusive licensing fee for software in a copyright infringement case.   Likewise, the fact that Menes is the co-creator of SMART and has personal knowledge about the development costs and field-testing of the software reveals nothing about Menes's knowledge or experience in calculating a reasonable licensing fee for a software application.   There is no evidence before the Court indicating that Menes has any professional or significant experience-based background, experience, training, or education in valuing software licensing or that Menes or MGMTL have ever sold a software license.[89]   As STI points out, Menes testified during his deposition that he has never sold a software license to anything he has created, and also confirmed that MGMTL has never sold a software license to anyone.[90]

The Court recognizes that MGMTL strenuously argues in its Opposition brief that Menes is qualified to opine on the fair market value or reasonable exclusive licensing fee for SMART because "MGMTL did sell a SMART license" to the Marine

---

[86] R. Doc. 91-2; R. Doc. 99-5.
[87] R. Doc. 91-2 at p. 2; R. Doc. 99-5 at p. 1, R. Doc. 99-2.
[88] *See, generally,* R. Docs. 91-1 & 121.
[89] *See,* R. Doc. 99-27 at pp. 2-4; R. Doc. 99-2.
[90] R. Doc. 91-3 at pp. 2 & 14.

Forces Reserve office in New Orleans, Louisiana in 2014 for $30,000.[91]   Nonetheless, MGMTL also acknowledges, somewhat reluctantly, that the sale fell through because "a government sequestration that fiscal year prevented the release of funds to pay for the SMART license."[92]   As explained by Menes during his deposition:

> Q  Has Managemental or MGMTL, for short, sold any software licenses?
>
> A  Yes, we - - we had sold a license to MARFORRES.
>
> . . . .
>
> Q  For What Product?
>
> A  For SMART.
>
> Q  Did they pay you for it?
>
> A. They did not pay me for it.
>
> . . . .
>
> Q  And why do you believe they agreed to pay you $30,000 to license SMART for one year?
>
> A  Well, over the course of a year, we provided sole source justification, provided a purchase request, provided documentation on what the client, MARFORRES, would receive, and we even signed a bailment agreement provided to us by the regional contracting office at MARFORRES.
>
> All of those steps, with the exception of receiving a check, in my opinion constitute a sale.
>
> Q  I see.  Did MARFORRES ever - - did MARFORRES ever sign a contract with MGMTL where MARFORRES agreed to pay MGMTL $30,000 to license SMART for one year?
>
> A  That was in the bailment agreement.  We never received a returned signed copy by the government, and in 2014, a thing called

---

[91] R. Doc. 99-27 at p. 7 & n.56; *See, Id.* at pp. 5, 15, 16,  21, & 25.
[92] *Id.* at p. 5, n.16 & pp. 15, 16 & n.56, 21.

> "sequestration" held up all discretionary funding for things like software, purchasing of vehicles, things like that.[93]

But simply believing that an unaccepted offer constitutes a sale does not make it so.

It is clear to the Court, from both the Opposition brief and Menes's deposition testimony, that a sale of the one-year license of the SMART software was never effectuated between MGMTL and the Marine Forces Reserve for $30,000. Further, Menes's testimony makes clear that MGMTL never received a signed contract, or bailment agreement, from the Marine Forces Reserve demonstrating its acceptance of that purchase price of $30,000. MGMTL points to no other sale of a software license by either Menes or MGMTL.[94] Thus, while Menes may offer testimony regarding MGMTL's discussions with the Marine Forces Reserve to sell a one-year license of the SMART software application for $30,000, as such testimony was likely "formed as a result of [his] knowledge of the case gained through direct observation,"[95] any opinions regarding the fair market value or reasonable exclusive licensing fee for SMART would "stray into opinions that [he] may have developed in preparation for the litigation of this matter."[96] Any such testimony would be subject to the expert report requirement of Fed. R. Civ. P. 26(a)(2)(B).[97] MGMTL has not directed the Court to any expert report prepared by Menes.

---

[93] R. Doc. 99-6 at pp. 2-4.
[94] *See, generally,* R. Doc. 99-27.
[95] *Ferrara Land Management Mississippi, LLC v. Landmark American Insur. Co.*, Civ. A. No. 1:19cv956-HSO-JCG, 2021 WL 4819461, at *2 (S.D. Miss. July 19, 2021).
[96] *Beechgrove Redev., LLC v. Carter & Sons Plumbing, Heating and Air-Conditioning, Inc.*, Civ. A. No. 07-8446, 2009 WL 981724, at *6 (E.D. La. Apr. 9, 2009).
[97] *Id.*

To the extent MGMTL claims that Menes is qualified to render an expert opinion regarding the fair market value of the SMART license based upon the fact that he priced it at $30,000 for the attempted sale to the Marine Forces Reserve, Menes's deposition testimony makes clear that he did not perform any calculation in setting that price. As STI points out, Menes testified that he valued the license at $30,000 for one year because "$30,000 seems to be the threshold that could be charged on a government charge card by, of course, an authorized approved agent with - - you know, with those charge cards."[98]  MGMTL does not address this testimony in its Opposition brief. The Court notes that MGMTL omitted Menes's testimony regarding the charge card limit from the deposition transcript that was submitted with its Opposition brief.[99]

Rather than address this issue directly, MGMTL opted instead to submit a new Declaration from Menes, dated May 17, 2021, in which he asserts that:

> The price of licensing SMART for one year was originally based on the labor cost savings it provided to the licensee.  SMART allowed the security management office at MARFORRES to reduce the security administration duties from four personnel down to one.  The $30,000 licensing fee is roughly the equivalent of the annual salary of a lance corporeal in the Marine Corps.  Licensing of SMART at $30,000 a year would thus allow a security management office to reduce its security administration labor costs by half.[100]

MGMTL relies upon this new Declaration to assert that Menes's determination that a one-year license of the SMART software application is not speculative, but "turns

---

[98] R. Doc. 91-3 at p. 27.
[99] *See*, R. Doc. 99-6 at pp. 26-27.
[100] R. Doc. 99-1 at ¶ 16.

on real world economic considerations."[101]  The Court agrees with STI that this new Declaration is merely an attempt by MGMTL to circumvent Menes's deposition testimony, as there is no indication from the deposition transcripts submitted by the parties that Menes ever testified that the $30,000 valuation was based upon "labor cost savings."[102]  Thus, the Court is not persuaded by the new Declaration that Menes is qualified to render an expert opinion on the fair market value or reasonable exclusive licensing fee for the SMART software application in this case.

To the extent MGMTL relies on *University Computing Co.* to argue that Menes has the professional background and experience to offer an opinion regarding the fair market value of a SMART license,[103] the Court disagrees and finds that case factually distinguishable.  There, the Fifth Circuit found no error in the lower court allowing Stan Josephson, the plaintiff's Vice President of Technical Services, to testify as an expert on the question of damages for the defendant's misappropriation of the plaintiff's computer system.[104]  In doing so, the Fifth Circuit pointed out that Josephson had testified that he was responsible for developing software systems, pricing them for marketing, and assisting as technical expert at sales presentations, and that in pricing a software system, he took into account such factors as development costs, the long-term potential for the system, and the plaintiff's sales objectives, as well as the current market for such systems.[105]

---

[101] R. Doc. 99-27 at p.18.
[102] *See*, R. Docs. 91-3, 99-6, & 121-1.
[103] R. Doc. 99-27 at p. 11-14 (citing *Univ. Computing Co. v. Lykes-Youngstown Corp.*, 504 F.2d 518, 536-38, 543 (5th Cir. 1974)).
[104] 504 F.2d at 543.
[105] *Id.*

Unlike the witness in *University Computing Co.*, MGMTL has failed to direct the Court to any evidence suggesting that Menes has similar prior experience in marketing or pricing software licenses for SMART, or any software for that matter, beyond the one unsuccessful sale of a license to one office of the Marine Forces Reserve.   More importantly, however, STI has produced evidence in the form of Menes's deposition testimony showing that: (1) Menes attributes most of the development of SMART to its co-creator, Whit Himel; (2) Menes admitted he is not a software expert; and (3) Menes has only ever priced the SMART software application, which was based upon the government's charge card limit.[106]  STI has also presented evidence showing that no one has ever purchased a one-year license of SMART for $30,000, despite MGMTL's attempts, and that Menes's only sales presentation experience, to two prospective customers other than STI, was unsuccessful.[107]  Thus, Menes's deposition testimony flatly contradicts MGMTL's assertion that Menes is qualified to render an expert opinion on the fair market value or reasonable exclusive licensing fee for SMART based upon his prior experience and training.  As cautioned by another Section of this Court, this seems to be a situation in which MGMTL is attempting "to avoid Rule 26(a)(2)(B)'s reporting requirements by having a regular employee testify on an issue instead of an expert."[108]

Based upon the foregoing analysis, the Court finds that MGMTL has failed to carry its burden of proving that Menes is qualified to offer opinion testimony

---

[106] R. Doc. 121 at p. 7 (*citing* R. Doc. 121-1 at pp. 4-5; R. Doc. 91-3 at pp. 16 & 27).
[107] R. Doc. 121 at p. 7 (*citing* R. Doc. 91-3 at p. 14; R. Doc. 121-2 at pp. 3-4).
[108] *Beechgrove Redevelopment, LLC v. Carter & Sons Plumbing, Heating and Air-Conditioning, Inc.*, Civ. A. No. 07-8446, 2009 WL 981724, at *5 (E.D. La. April 9, 2009).

regarding the fair market value or reasonable exclusive licensing fee for all rights to SMART.

### D. MGMTL Has Failed to Show That Menes's Opinions Regarding the Fair Market Value or Reasonable Exclusive Licensing Fee For SMART Are Reliable Under Rule 702.

The Court further finds that, even if Menes is qualified to provide opinion testimony regarding the fair market value or reasonable exclusive licensing fee for the SMART software application, such opinions must be excluded as unreliable under Fed. R. Evid. 702.  To satisfy the reliability prong of the *Daubert*/Rule 702 analysis, a "party seeking to introduce expert testimony must show (1) the testimony is based upon sufficient facts or data, (2) the testimony is the product of reliable principles and methods, and (3) the witness has applied the principles and methods reliably to the facts of the case."[109]  To prove reliability, the proponent of the expert testimony must present some objective, independent validation of the expert's methodology.[110]  As explained by the Supreme Court, the objective of this Court's gatekeeper role is to ensure that an expert "employs in the courtroom the same level of intellectual rigor that characterizes the practice of an expert in the relevant field."[111]

---

[109] *Recif Resources, LLC v. Juniper Capital Advisors, L.P.*, Civ. A. No. H-19-2953, 2020 WL 5623982, at *2 (S.D. Tex. Sept. 18, 2020) (Atlas, J.) (quoting *Huss v. Gayden*, 571 F.3d 442, 452 (5th Cir. 2009)) (internal quotation marks omitted).

[110] *Recif Resources, LLC*, Civ. A. No. H-19-2953, 2020 WL 5623982 at *2 (citing *Brown v. Illinois Cent. R. Co.*, 705 F.3d 531, 536 (5th Cir. 2013)).

[111] *Kumho Tire Co., Ltd. v. Carmichael*, 526 U.S. 137, 152, 119 S.Ct. 1167, 1176, 143 L.Ed.2d 238 (1999); *Hodges v. Mack Trucks Inc.*, 474 F.3d 188, 194 (5th Cir. 2006).

### 1. *Menes's Opinions Are Based Upon Sufficient Facts or Data.*

As STI points out,[112] the Fifth Circuit has recognized that, "The *Daubert* reliability analysis applies to, among other things, 'the facts underlying the expert's opinion.'"[113] "In particular, an opinion based on 'insufficient, erroneous information,' fails the reliability standard."[114] The Fifth Circuit has further cautioned that, "Although the *Daubert* reliability analysis is flexible and the proponent of the expert evidence need not satisfy every one of its factors, 'the existence of sufficient facts . . . is in all instances mandatory.'"[115] Thus, "expert testimony that relies on 'completely unsubstantiated factual assertions' is inadmissible."[116] Nevertheless, the Fifth Circuit has made clear that, "[a]s a general rule, questions relating to the bases and sources of an expert's opinion affect the *weight* to be assigned that opinion rather than its *admissibility* and should be left for the jury's consideration."[117] "It is the role of the adversarial system, not the court, to highlight weak evidence."[118]

STI asserts that Menes's opinion testimony regarding the fair market value or reasonable exclusive licensing fee for SMART is not based on sufficient facts or data because it is based upon assumptions regarding the price of a one-year license for the

---

[112] R. Doc. 91-1 at p. 4.

[113] *Moore v. Int'l Paint, LLC*, 547 Fed.Appx. 513, 515 (5th Cir. 2013) (quoting *Knight v. Kirby Inland Marine Inc.*, 482 F.3d 347, 355 (5th Cir. 2007)); *Jacked Up, LLC v. Sara Lee Corporation*, 291 F. Supp. 3d 795, 802 (N.D. Tex. 2018) (Horan, M.J.) (quoting *Moore*, 547 Fed.Appx. at 515).

[114] *Moore*, 547 Fed.Appx. at 515 (quoting *Paz v. Brush Engineered Materials, Inc.*, 555 F.3d 383, 389 (5th Cir. 2009)).

[115] *Moore*, 547 Fed.Appx. at 515 (quoting *Hathaway v. Bazany*, 507 F.3d 312, 318 (5th Cir. 2007)) (internal citation omitted).

[116] *Moore*, 547 Fed.Appx. at 515 (quoting *Hathaway*, 507 F.3d at 319, n.4).

[117] *Primrose Operating Co. v. National American Ins. Co.*, 382 F.3d 546, 562 (5th Cir. 2004) (quoting *United States v. 14.38 Acres of Land, More of Less Sit. In Leflore County, Miss*, 80 F.3d 1074, 1077 (5th Cir. 1996)) (internal quotation marks omitted) (emphasis added by *Primrose*).

[118] *Primrose*, 382 F.3d at 562.

SMART software application, the number of licenses that would have been sold to the military, the duration of the licenses and, for the higher damages estimate, a royalty fee, a fee for technical services provided by MGMTL, and payment for the hours spent by Menes and Himel to develop SMART.[119]  STI argues that the assumptions are speculative and not based in fact because MGMTL never sold a license to SMART.[120]

Although difficult to decipher, MGMTL seems to argue that Menes's testimony regarding the fair market value of a SMART license is not speculative because the $30,000 price for a one-year license of SMART is based upon the price at which MGMTL sold a license to the Marine Forces Reserve, and because STI valued its own copycat PASS software at $214,094 per year.[121]  MGMTL contends that Menes then multiplied $30,000 by five years, "the period of time during which STI has taken unrestricted access to [SMART],"[122] and multiplied that number "by a conservative estimate of licensees Menes knew were doable and realistic" based upon his own experience in the field.[123]  According to MGMTL, "Within MARFORRES (which is only one component of the entire Marine Corps), there are 51 units across the United States and so represent 51 potential licensees.  A five-year license to each of these generates revenue of $7.65 million."[124]  MGMTL further asserts that, "MARFORRES was used as a baseline for predicting sales because it constitutes 'low hanging fruit' closely connected to Menes's experience and accessible through its position and

[119] R. Doc. 91-1 at pp. 4-5.
[120] *Id*. at p. 5.
[121] R. Doc. 99-27 at pp. 17 & 19.
[122] *Id*. at p. 19.
[123] *Id*. at pp. 18 & 19.
[124] *Id*. at p. 19.

proven record within the MARFORRES security management office and his personal contacts."[125]  As STI points out in its Reply brief, MGMTL does not attempt to explain the basis for Menes's higher damages estimate of $89.8 million.[126]

During his deposition, Menes testified that his lower estimate of $7.65 million was reached by multiplying $30,000, his price for a one-year license of the SMART software application, by 51 licenses over the course of five years, which is the length of time that STI had unrestricted use of SMART.[127]  Menes valued a one-year license of the SMART software application at $30,000 because "That was the calculation that we presented to MARFORRES, so that was the calculation that we would have presented to STI."[128]  Menes explained that the 51 licenses "included MARFORRES and the 50 battalions at MARFORRES that Steve McMurtry at the time of his licensing of SMART believed that the SMART application would be capable of being plugged into every one of the battalions at MARFORRES."[129]  When asked whether he took any steps to check the reliability of the 51-license assumption, Menes testified that, "The one person in the Marine Corps that could have authorized and would have authorized such a procurement was Steve McMurtry at the time.  There was no other individual."[130]  As for the higher estimate of $89.8 million, Menes testified that he reached that number by multiplying a one-year, $30,000 license by five years, and multiplying that number by 500 licenses.[131]  Menes explained that, "We also believed

---

[125] R. Doc. 121 at p. 10; *See, generally*, R. Doc. 99-27.
[126] R. Doc. 121 at p.
[127] R. Doc. 91-3 at p. 6.
[128] *Id*. at p. 4.
[129] *Id*. at p. 17.
[130] *Id*. at p. 19.
[131] *Id*. at pp. 4-5 & 6-7.

that contacts with the Marine Corps, specifically Steve McMurtry and MARFORRES and the Navy, that that would have potentially included a conservative number of 500 licenses,"[132] and that, "from conversations with STI, we believed that 500 licenses was the minimum amount that we could get between the Navy and the Marine Corps."[133]

The Court finds that, although the facts relied upon by Menes in calculating the fair market value or reasonable exclusive licensing fee for SMART are thin, they are sufficient for purposes of *Daubert*.   The Court remains cognizant that, notwithstanding *Daubert*, "the rejection of expert testimony is the exception and not the rule."[134]   Thus, to the extent that STI is attacking the factual basis of Menes's opinions, such arguments address the weight to be assigned to those opinions, rather than their admissibility at trial.[135]   The Court is fully satisfied that, during trial, counsel for STI is perfectly able to, and will, take the opportunity to vigorously cross-examine Menes regarding the bases for his opinions.

### 2.   *Menes's Opinions Are Not The Product of Reliable Methodologies.*

Although Menes's opinions regarding the fair market value or reasonable exclusive licensing fee for SMART are based upon sufficient facts, the Court finds that his opinions must be excluded under Rule 702 because they are not based upon

---

[132] *Id*. at p. 4.

[133] *Id*. at p. 7.

[134] *Johnson v. Samsung Electronics America, Inc.*, 277 F.R.D. 161, 165 (E.D. La. 2011) (Duval, J.) (*quoting* Fed. R. Evid. 702 Advisory Committee Notes to 2000 Amendments) (internal quotation marks omitted).

[135] *See, Tyler v. Union Oil Co. of Cal.*, 304 F.3d 379, 393 (5th Cir. 2002) ("Unocal instead attempts to show that the underlying data – provided by Unocal – was itself unreliable.   This is an issue that Unocal could – and did – raise in cross-examination.").

reliable principles or methods.  The Supreme Court in *Daubert* set forth the following non-exclusive list of factors to consider in determining the reliability of expert testimony: (1) whether the theory has been tested; (2) whether the theory has been subject to peer review and publication; (3) the known or potential rate of error; (4) whether standards and controls exist and have been maintained with respect to the technique; and (5) the general acceptance of the methodology in the scientific community.[136]  Whether some or all of these factors apply in a particular case depends on the facts, the expert's particular expertise, and the subject of his testimony.[137]  The Fifth Circuit has held that a trial court may consider additional factors in assessing the scientific reliability of expert testimony, including: (1) whether the expert's opinion is based on incomplete or inaccurate data; (2) whether the expert has unjustifiably extrapolated from an accepted premise to an unfounded conclusion; and (3) whether the expert has adequately accounted for alternative explanations.[138]  "The overarching goal 'is to make certain that an expert, whether basing testimony on professional studies or personal experience, employs in the courtroom the same level of intellectual rigor that characterizes the practice of an expert in the relevant field.'"[139]

As previously mentioned, Menes testified that his opinions are based upon a calculation in which he multiplied the price of a one-year license of the SMART software application ($30,000), by the number of licenses he believes MGMTL could

---

[136] *In re: Vioxx Products Liability Litigation*, 401 F. Supp. 2d 565, 573 (E.D. La. 2005) (Fallon, J.) (citing *Daubert v. Merrell Dow Pharmaceuticals, Inc.*, 509 U.S. 579, 593-95, 113 S.Ct. 2768, 125 L.Ed.2d 469 (1993)).
[137] *In re: Vioxx*, 401 F. Supp. 2d at 573 (citing *Kumho Tire Co., Ltd. v. Carmichael*, 526 U.S. 137, 13, 119 S.Ct. 1167, 143 L.Ed.2d 238 (1999)).
[138] *Nola Ventures, LLC v. Upshaw Insurance Agency, Inc.*, Civ. A. No. 12-1026, 2014 WL 12721798, at *6 (E.D. La. Oct. 31, 2014) (Brown, J.) (citing *Black v. Food Lion Inc.*, 171 F.3d 308, 313 (5th Cir. 1999); *Moore v. Ashland Chemical Inc.*, 151 F.3d 269, 278-79 (5th Cir. 1998); *In re Vioxx*, 401 F. Supp 2d at 573).
[139] *Nola Ventures, LLC*, Civ. A. No. 12-1026, 2014 WL 12721798 at *6 (quoting *Kumho Tire*, 526 U.S. at 152, 119 S.Ct. at 1176).

have sold to the military (at least 51 and up to 500), and multiplied that number by the length of time that STI had unrestricted access to SMART (five years).  According to MGMTL, Menes valued a one-year license at $30,000 because that was the price at which it sold a one-year license to the Marine Forces Reserve.[140]  Menes admitted, however, that he did not know how much STI was willing to pay to license SMART,[141] that MARFORRES never actually licensed the SMART software for $30,000,[142] and that MGMTL has never sold technical services or a software license to anyone.[143] More importantly, however, Menes further testified that the price of a one-year license for the SMART software application was set at $30,000 because that "seems to be the threshold that could be charged on a government charge card by, of course, an authorized approved agent with - - you know, with those charge cards."[144]  Thus, the evidence before the Court suggests that Menes valued a one-year license at $30,000 based upon the credit card limit of its potential customer, rather than actual information regarding its fair market value.

With respect to the number of licenses that MGMTL could have sold in the five years that STI had the SMART software application, Menes testified that he believed 500 licenses was a "conservative number" based upon MGMTL's contacts with Steve McMurtry, MARFORRES, and the Navy.[145]  Menes explained, "[F]rom conversations with STI, we believed that 500 licenses was the minimum amount that we could get

---

[140] R. Doc. 99-27 at pp. 17 & 19.
[141] R. Doc. 91-3 at p. 11.
[142] *Id*. at p. 3.
[143] *Id*. at p. 14.
[144] R. Doc. 91-3 at p. 27.
[145] *Id*. at p. 4.

between the Navy and the Marine Corps.  Multiply 500 by 30,000 times 5 is $75 million."[146]  Menes explained that to calculate MGMTL's royalty fee, he "tacked an additional 15 percent off on those 500 licenses, comes out to 11 million point 65."[147] Menes likewise testified that he added another $3 million to that calculation to account for "technical assistance" provided by Menes and Himel,[148] and added an additional $600,000 for development costs.[149]

As for the lower end of 51 licenses, Menes testified that "Steve McMurtry at the time of his licensing of SMART believed that the SMART application would be capable of being plugged into every one of the battalions at MARFORRES," of which there are 51.[150]  When asked directly if he did anything to check the reliability of his assumption that MGMTL could sell 51 licenses to MARFORRES, Menes repeatedly answered "no."[151]  Menes further answered that Steve McMurtry was the one person in the Marine Corps who could have authorized such a procurement of the SMART license and that McMurtry "said he wanted it at 51 units, I mean that's the guy that told me.  I mean that's what was told to me, that that was the plan."[152]  Menes testified that he believed it was "100 percent probable" that MGMTL was going to be able to sell 51 licenses to MARFORRES based upon his discussions with Steve McMurtry because "the man asked me and told me he was going to license it 50 more times, so I have no reason to believe it would have been less, no, or more, for that

---

[146] R. Doc. 91-3 at p. 7.
[147] *Id.* at pp. 5, 7, & 11.
[148] *Id.* at pp. 8 & 12.
[149] *Id.* at p. 8; R. Doc. 99-6 at pp. 14, 37-41.
[150] R. Doc. 91-3 at p. 17.
[151] *Id.* at pp. 18 & 21.
[152] *Id.* at p. 19.

matter."[153]  According to Menes, "There was an assumption.  It was based off of what McMurtry had told me he wanted to happen."[154]

Although Menes testified that these valuations are based upon his "understanding and fact of the marketplace" and that he "understand[s] economics,"[155] Menes stated that he did not consult any technical documents and that he is not an expert in software or in calculating the fair market value or reasonable licensing fees for software.[156]  Menes testified that the co-creator of SMART, Whit Himel, has "been in the business for a long time creating database utilities for oil companies.  So what I would tell you, a lot of my valuations on what SMART was worth came from his 40-plus years of experience.  So, yeah, I would say Whit's an expert.   I consulted an expert."[157]   Menes also testified that the "scientific information" he used to calculate damages was "the market, the market being MARFORRES."[158]  When asked if he conducted a survey in connection with his opinion as to the fair market value or reasonable exclusive licensing fee for all rights to SMART, Menes stated:

> Again, I don't need to take a survey for something that I have created. I understand the labor.  I understand the economy of scale.  I understand the demand.  I understand the placement of our product.  I had enough

---

[153] *Id.* at p. 41.
[154] R. Doc. 99-6 at p. 26.
[155] R. Doc. 91-3 at pp. 5 & 16; R. Doc. 99-6 at p. 51.
[156] R. Doc. 91-3 at pp. 15 & 16; R. Doc. 99-6 at p. 17.
[157] R. Doc. 99-6 at p. 16.
[158] R. Doc. 91-3 at pp. 17-18.

experience with the help of Whit Himel and his 40 years to position, price, and license SMART. I didn't need a survey.[159]

Menes subsequently clarified that, "No, I did not need to conduct a survey. I did not need a survey to answer those questions. I was able to answer them myself."[160] When asked if he talked to "anyone else in any other government or military agency and ask them what they would pay to license SMART," Menes said "no."[161]

The Court finds that Menes's calculations of the fair market value or reasonable exclusive licensing fee for SMART as "$7,650,000 to $89,870,000" were based solely upon unreliable methodologies, including assumptions made from conversations he had with Steve McMurtry and Whit Himel, a credit card limit, and an unconsummated sale of a one-year license to MARFORRES. Menes very plainly stated that he performed no market analysis to verify the reasonableness or accuracy of his calculations. In fact, it is clear to the Court that Menes performed no independent research, beyond his discussions with Steve McMurtry or Whit Himel, regarding the numbers he used to calculate the fair market value or reasonable exclusive licensing fee for SMART. Thus, there is no "concrete" evidence before the Court to support Menes's opinion regarding the fair market value or reasonable exclusive licensing fee for the SMART software application, such as market surveys or quotes solicited from other companies regarding the cost to create and license analogous works.[162] Other courts, including this Court, have excluded expert

---

[159] *Id.* at p. 32.
[160] *Id.*
[161] *Id.* at p. 33.
[162] *See*, *Recif Resources, LLC v. Juniper Capital Advisors, L.P.*, Civ. A. No. H-19-2953, 2020 WL 5623982, at *1, 5 (S.D. Tex. Sept. 18, 2020) ("Bersin's methodology of soliciting multiple quotes to

opinions where the expert failed to conduct any independent research to determine the reliability of his assumptions.[163]

The Court reaches the same conclusion in this case as to Menes's opinion testimony. It is evident that Menes merely accepted as true the information provided to him by McMurtry regarding his interest in licensing the SMART software application at the 51 battalions of the Marine Forces Reserve and performed no independent analysis of those numbers. Thus, Menes's theory cannot be tested. The Court finds that MGMTL has failed to establish that Menes reached his opinions regarding the fair market value or reasonable exclusive licensing fee for SMART using "the same level of intellectual rigor that characterizes the practice of an expert in the relevant field."[164] Instead, this appears to be an attempt by MGMTL to present its own estimation of damages in the guise of an expert opinion.[165] MGMTL has also failed to show that Menes was impartial in formulating his opinions, which is especially troubling since he is the co-creator of the SMART software application and a major member/manager of MGMTL. The Court therefore concludes that STI's Motion must be granted to the extent that STI seeks to exclude any opinion testimony from Menes regarding his calculations of the fair market value or reasonable

---

determine the reasonable royalty/license fee for the copyrighted works based on the market value of obtaining analogous works is a rational, reliable methodology.").

[163] *JRL Enterprises, Inc. v. Procorp Associates, Inc.*, Civ. A. No. 01-2893, 2003 WL 21284020, at *7-8 (E.D. La. June 3, 2003) (Fallon, J.) (citing authority).

[164] *Kumho Tire Co., Ltd. v. Carmichael*, 526 U.S. 137, 152, 119 S.Ct. 1167, 1176, 143 L.Ed.2d 238 (1999).

[165] *JRL Enterprises, Inc.*, Civ. A. No. 01-2893, 2003 WL 21284020 at *8.

exclusive licensing fee for all rights to SMART, as MGMTL has failed to show that Menes's calculations are reliable under Rule 702.[166]

### E. MGMTL Has Failed to Show That Menes's Opinions Regarding the Fair Market Value or Reasonable Exclusive Licensing Fee For SMART Are Admissible Under Rule 701.

To the extent that MGMTL asserts that Menes should be allowed to offer opinion testimony regarding the value of SMART under Federal Rule of Evidence 701,[167] the Court finds that such opinions fall outside the scope of lay opinion testimony. Rule 701 provides that if a witness is not testifying as an expert, his testimony is limited to opinions that are: "(a) rationally based on the witness's perception; (b) helpful to clearly understanding the witness's testimony or to determining a fact in issue; and (c) not based on scientific, technical, or other specialized knowledge within the scope of Rule 702."[168] It is well settled in this Circuit that, "a person may testify as a lay witness only if his opinions or inferences do not require any specialized knowledge and could be reached by any ordinary person."[169]

MGMTL has made no showing that the fair market value or reasonable exclusive licensing fee for SMART could be determined by an ordinary person. Instead, MGMTL cites two Fifth Circuit cases, *LaCombe v. A-T-O, Inc.* and *King  v.*

---

[166] Because the Court finds that Menes's expert opinions are not reliable under Rule 702, the Court need not address whether they are relevant. *See, JRL Enterp., Inc.*, Civ. A. No. 01-2893, 2003 WL 21284020 at *6 ("After the proponent of the expert testimony has carried her burden of showing reliability, the party must also prove the expert opinions' relevance.").

[167] R. Doc. 99-27 at pp. 22-25.

[168] Fed. R. Evid. 701.

[169] *Doddy v. Oxy USA, Inc.*, 101 F.3d 448, 460 (5th Cir. 1996) (citing *Brady v. Chemical Constr. Corp.*, 740 F.2d 195, 200 (2d Cir. 1984)).

*Ames*, for the proposition that the owner of property is qualified by his ownership alone to testify as to its value.[170]  The Court finds those cases clearly distinguishable from the facts of this case, as *LaCombe* concerned testimony of a homeowner regarding the value of his home and furnishings and the Fifth Circuit relied upon case law addressing the admissibility of testimony concerning the value of movable and immovable property.[171]  While the Fifth Circuit in *King* allowed a daughter to testify regarding the value of damages resulting from the misappropriation of the name and likeness of her father, a famous musician, it did so, at least in part, because "the image was her father's and she had engaged in some limited transactions involving the marketing of her father's name and likeness" and her testimony was not "based on naked conjecture and speculation."[172]  Unlike *King*, MGMTL has not directed the Court to any evidence showing that Menes has engaged in successful negotiations or marketing of a SMART license.  As such, the Court finds that opinion testimony from Menes regarding the fair market value or reasonable exclusive licensing fee for SMART would "be based on naked conjecture or solely speculative factors,"[173] as Menes's calculations were based solely upon assumptions made from conversations he had with Steve McMurtry and Whit Himel, a credit card limit, and an unconsummated sale of a one-year license to MARFORRES.

---

[170] R. Doc. 99-27 at pp. 22-23 (citing *LaCombe*, 679 F.2d 431, 433 (5th Cir. 1982); *Ames*, 179 F.3d 370, 376 (5th Cir. 1999)).

[171] *LaCombe*, 679 F.2d at 434-35 (citing authority).

[172] *King*, 179 F.3d at 376-77 ("King explained that she had informally conducted business on behalf of the heirs of Freddie King and the Freddie King estate for over ten years.  King testified that she was familiar with the commercial value of her father's name and likeness because of her prior involvement in negotiations to market that name and likeness on T-shirts.  Nothing in the record appears to rebut this testimony.") (footnotes omitted).

[173] *Id*. at 376 (citation omitted).

Based on the foregoing analysis, the Court agrees with STI that the fair market value or reasonable exclusive licensing fee for SMART is not within the realm of knowledge of the average lay person.[174]   As such, Menes cannot offer opinion testimony regarding the fair market value or reasonable exclusive licensing fee of SMART under the guise of Rule 701 lay opinion testimony.  This finding, as detailed above, is limited to restricting Menes's opinion testimony regarding the fair market value or reasonable exclusive licensing fee of SMART.  STI has not sought, nor will the Court provide, any broader findings as to Menes's testimony.

## IV.   CONCLUSION

For the foregoing reasons, **IT IS HEREBY ORDERED** that Defendant's Motion *in Limine* to Preclude Opinion Testimony of Jorge Menes[175] is **GRANTED in part and DENIED in part.**  The Motion is **GRANTED** to the extent that STI seeks to exclude the opinion testimony of Jorge Menes regarding his calculation of the fair market value or reasonable exclusive licensing fee for SMART as between $7,650,000 and $89,870,000**,** as set forth in the Summary Opinion dated January 28, 2021.[176] The Motion is **DENIED** to the extent that STI seeks to exclude "the opinion testimony of Jorge Menes at trial on any matters relating to damages," as Menes may offer opinion testimony under Fed. R. Civ. P. 26(a)(2)(C) regarding matters related to his

---

[174] R. Doc. 91-1 at p. 11.
[175] R. Doc. 91.
[176] R. Doc. 91-2.

personal involvement in the events that gave rise to this litigation as long as those opinions were not produced specifically in preparation for the trial of this matter.

New Orleans, Louisiana, February 16, 2022.

**WENDY B. VITTER**
**United States District Judge**