# UNITED STATES DISTRICT COURT

## EASTERN DISTRICT OF LOUISIANA

| | | |
|---|---|---|
| **MGMTL, LLC** | * | **CIVIL ACTION: 20-2138** |
| | * | |
| | * | **JUDGE: WENDY B. VITTER** |
| **VERSUS** | * | |
| | * | **SECTION: D** |
| | * | |
| **STRATEGIC TECHNOLOGY** | * | **MAGISTRATE JUDGE: NORTH** |
| **INSTITUTE, INC.** | * | |
| | * | **DIVISION: 5** |

**\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\***

## <u>JOINT PRETRIAL ORDER</u>

**Date of Pre-Trial Conference**

February 17, 2022 at 9 am.

**Appearance of Counsel**

a.   Plaintiff – MGMTL, LLC

Thomas M. Flanagan (#19569)
Harold J. Flanagan (#24091)
Camille E. Gauthier (#34558)
Dennis O. Durocher, Jr. (#36441)
FLANAGAN PARTNERS LLP
201 St. Charles Ave., Suite 3300
New Orleans, Louisiana 70170
Telephone: (504) 569-0235

b.   Defendant – Strategic Technology Institute, Inc.

Michael W. Magner (#01206)
Micah J. Fincher (#33830)
Jones Walker LLP
201 Saint Charles Ave., Suite 5100
New Orleans LA, 70170-5100
Telephone: (504) 582-8464

James Y. Boland (pro hac vice)
Nicholas M. DePalma (pro hac vice)

Taylor S. Chapman (pro hac vice)
Christian R. Schreiber (pro hac vice)
VENABLE LLP
8010 Towers Crescent Drive, Suite 300
Tysons, VA 22182
Telephone: (703) 760-1600

## I.   <u>Description of the Parties</u>

### 1.   **Plaintiff**

The plaintiff is MGMTL, LLC, which is a Louisiana limited liability company. Its members are Jorge Menes, who is domiciled in Louisiana, and Whit Himel, who is domiciled in Louisiana.

### 2.   **Defendant**

The defendant is Strategic Technology Institute, Inc. ("STI"), which is a Delaware corporation with its principal place of business at 6000 Executive Blvd., Suite 205, Rockville, Maryland 20852.

## II.   <u>Jurisdiction</u>

This Court has subject matter jurisdiction over this case under 28 U.S.C. § 1338 because it raises a copyright infringement claim under 17 U.S.C. § 101 *et seq.*

Plaintiff contends that this Court also has jurisdiction under 18 U.S.C. § 1836 based on a trade secret misappropriation claim under the Defend Trade Secrets Act.

However, Defendant disputes that this Court has jurisdiction under 18 U.S.C. § 1836 and disputes that Plaintiff has asserted a trade secret misappropriation claim under the Defend Trade Secrets Act. The parties have briefed this issue at Rec. Docs. 179-180.

This Court also has diversity jurisdiction under 28 U.S.C. § 1332 because there is complete diversity of citizenship and the amount in controversy exceeds $75,000. This Court has subject

matter jurisdiction over MGMTL's state law breach of contract and trade secret misappropriation claims under 28 U.S.C. § 1367.

Defendant disputes that the plaintiff is entitled to amounts in excess of $75,000, exclusive of interest and costs.

**III.   A List and Description of any Motions Pending or Contemplated**

The following motions are currently pending:

1. Rec. Doc. 93 – STI's motion for summary judgment.

2. Rec. Doc. 177 - STI's motion to limit MGMTL's damages to statutory damages for copyright infringement.

3. Rec. Doc. 179/Rec. Doc. 180 – pre-trial briefing regarding DTSA claim

**IV.   Summary of Material Facts Claimed by the Parties**

**1.   Plaintiff**

**a.   MGMTL develops and designs SMART and obtains a registered copyright to the SMART computer program.**

Beginning around 1998, Jorge Menes, then a full-time college student, began creating a security management database in his spare time, spending at least 1,000 hours to do so. Throughout 2012 and 2013, Menes and his partner, Whit Himel, formed MGMTL and spent significant time refining and improving the database. Treating the effort for many months as equivalent to a full-time job, Menes spent about 2,000 hours developing and designing SMART (in addition to the 1,000 hours he had already spent establishing the pre-SMART security management database) and Himel spent about 3,000 hours on SMART. Menes values the software development time put in at $100 per hour, for a total development cost of $600,000.

SMART is a personnel and physical security application capable of instantaneously evaluating thousands of personnel records and applying security clearance guidelines to generate

appropriate forms, approvals, and permissions unique to each individual. It is the first of its kind and an extremely valuable tool to help manage all areas of security and security reporting. While certain reports and forms that SMART generates are reports or correspondence in compliance with applicable Department of Defense rules or regulations, there are no mandates or requirements as to what should be included in a security management software like SMART. MGMTL exhibited creative expression and made the design choices with respect to the word selection, sequences, organization, structure, menu structures, screen displays, and user interface of SMART.

MGMTL obtained a registered copyright for the SMART "computer program" in 2013. Pursuant to instructions from the U.S. Copyright Office, MGMTL submitted portions of the SMART source code to the U.S. Copyright Office. Because the source code is what generates those aspects of the software as viewed by a user (*i.e.*, the screen displays), submission of source code is all that was needed to obtain a certificate of copyright registration for the SMART computer program as a whole, including all of SMART's visual aspects like its screen displays.

While SMART was being developed and refined, it was used on a trial basis in the security management office of the Marine Forces Reserve ("MARFORRES") in New Orleans. Several MARFORRES officials, including its chief security manager Steve McMurtry, its deputy security management officer Don Washington, and John Zimmer, a security specialist, found SMART to be an extremely valuable tool in streamlining and facilitating security management tasks. McMurtry therefore initiated "sole source justification" paperwork for SMART, which applies when a government entity wishes to purchase a product that is one of a kind, or it is very special in what it can do. MGMTL sold a SMART license to MARFORRES for a fee of $30,000 per year (though the funds were not able to be released due to government sequestration at the time).

   **b.**  **MGMTL enters a business relationship with STI with the expectation that STI will promote, market, and distribute SMART.**

In 2015, MGMTL and STI, a company experienced in contracting within the government sector, entered a business relationship. MGMTL envisioned that STI would provide distribution, marketing, and other support services to MGMTL in connection with SMART.

SMART is a trade secret that derives independent economic value from the fact that its contents are not readily ascertainable by others and was maintained in confidence so as to limit access and impose restrictions to access. To that end, MGMTL and STI signed a software evaluation agreement where STI received a copy of the SMART application to evaluate it but was made to acknowledge that SMART contained confidential and proprietary information and agreed to maintain the SMART software in confidence and not to share it outside of STI.

Having liked what it saw, STI then entered into a distributor agreement with MGMTL. In that contract, STI acknowledged that MGMTL owned the SMART software and related documentation as well as all updates or derivative works. The distributor agreement granted STI narrow permission to "advertise, promote, and resell" the SMART software application to end-users. STI again agreed that the SMART software was proprietary to MGMTL and that MGMTL retained all right and interest in and to the SMART software, which included all copyrights and other proprietary rights of any kind. STI promised not to reverse engineer, reverse compile, or otherwise disassemble the SMART software application, and it agreed to make no claims to any copyright or proprietary right in or to the SMART software ever in the future. All rights not specifically granted to STI were reserved by MGMTL.

   **c.**  **STI copies SMART and converts it to a web-based application; it never tells MGMTL that it is changing the name to PASS or claiming that PASS is STI's own intellectual property.**

Under the distributor agreement, STI was supposed to market, promote, and sell SMART.

But once STI received access to SMART, it instead directed its efforts to converting SMART from a Microsoft Access-based computer program into a web-based program.

STI executives believed that SMART was "truly an impressive tool, and it will sell." It provided SMART to software developers in India to create a web-based, copycat version of SMART. As soon as MGMTL heard about STI's efforts to do so, MGMTL contacted its intellectual property attorney. MGMTL was assured that under copyright law and the parties' agreement, any resulting version of SMART was the intellectual property of—and would be owned by—MGMTL.

Behind the scenes, however, and unknown to MGMTL, STI was changing the name of the SMART software to "PASS," changing the color scheme of the user interface, cutting MGMTL out of all communications, and plotting to take the position that the copycatted SMART software STI was now calling PASS was actually STI's own intellectual property. STI was always sure to use the term "SMART" in all of its communications with MGMTL, but internally it called the software project PASS. STI even went so far as to ask MGMTL for promotional materials for SMART, only for STI to days later secretly copy them word-for-word (even copying MGMTL's typographical and grammatical errors) as promotional materials for PASS without ever cluing in MGMTL. Devastating emails reveal this plan and confirm that STI acted intentionally and purposefully to accomplish this goal and to keep MGMTL in the dark.

        **d.**     **STI misrepresents to MGMTL that it is done with SMART and that it wants nothing to do with SMART in any way moving forward.**

After secretly changing the name of the software from SMART to PASS, STI ignored communications from MGMTL for months. STI finally informed MGMTL by email in 2017 that it did not wish to remain in business with MGMTL. MGMTL responded by asking STI to send over the documentation to terminate the parties' distributor relationship and to return MGMTL's

intellectual property in its possession. In response, STI's director of operations confirmed that the parties' relationship was terminated ("nothing further required"). He reported that STI had no interest in SMART and would not move forward with anything related to SMART.

> **e.    STI then distributes PASS for use at MARFORRES; MGMTL first hears limited information about one act of infringement in November 2017, learning details of the infringement in 2019 and 2020.**

Despite STI's unambiguous misstatement to MGMTL that it had no interest in SMART, STI actually had further plans for SMART. In November 2017, a MARFORRES employee familiar with SMART saw individuals installing software at MARFORRES and caught a glimpse of the software on the screen, which appeared similar to MGMTL's SMART, though the MARFORRES employee was not given access so lacked any additional details or information. As it turns out, for at least a year, MARFORRES was using the PASS software (copied from MGMTL's SMART intellectual property) in its security management office.

Many months after PASS was installed at MARFORRES, MGMTL received an anonymous email from an STI whistleblower that explained the infringement in greater detail: "Jorge – I wanted to inform you how STI is cheating you: STI took the SMART application that you built and repackaged it as PASS application and sold to MFR [MARFORRES]." Menes forwarded the email to be investigated further so that the veracity of the allegations could be reviewed.

> **f.    STI continues to infringe by listing PASS on its GSA Schedule such that PASS is made available for sale to government buyers for a "fair and reasonable" one-year license price of $214,094 per license.**

STI's efforts with PASS extended well beyond MARFORRES. In 2019, STI listed PASS on its General Services Administration (GSA) Schedule. A GSA Schedule is a United States government contracting vehicle for offering products and services to all manner of state and federal

government agencies and government contractors. As MGMTL's expert will explain, to list a product through the GSA, STI had to submit documentation and convince the federal government that its listed price for a one-year PASS license was "fair and reasonable." STI succeeded in doing so and PASS was included on its 2019-2024 GSA Schedule for $214,094 per one-year license. This meant that PASS was listed for sale to the public on the GSA Advantage website as if the product were STI's own intellectual property.

In 2018-2019, STI invested in further development and promotion of PASS—bringing on third-party consultants and contractors. As recently as 2020, STI continued to promote PASS by describing it as a "value add" to users.

> **g.   STI is liable to MGMTL and owes damages for its infringement, misappropriation, and breaches; MGMTL is also entitled to injunctive relief.**

MGMTL's computer expert received and compared the literal and non-literal elements of SMART to PASS. His analysis reflected that STI's PASS used a different programming language than MGMLT's SMART but that STI's source code nevertheless exhibited copying as STI essentially translated MGMTL's source code into a different language (*e.g.*, like translating Harry Potter from English to Spanish). As to the non-literal elements of the software, MGMTL's expert found that the copyrightable expression embodied in the sequence, organization, structure, screen displays, user interface, and menu structures of SMART was copied by STI and is contained in PASS. (PASS even contains many of the same idiosyncrasies of SMART, such as, for example, the same misspelling of the word "security" on the same specific screen display). MGMTL's expert determined that the PASS computer program is substantially similar to the copyrightable expression embodied in the SMART computer program.

MGMTL has suffered damages because of STI's intentional infringement, willful misappropriation, and breaches of contract. Menes, the creator of SMART, manager of MGMTL, and with years of experience in the field of security management, will testify about his experience in the field, the work that went into the SMART product (at least 6,000 hours which at the time of creation were valued as worth $100/hour), the field-testing that honed the product, the rave reviews from those who used it, the receptivity of buyers to the $30,000 price per one-year license, the contemporaneous plan for a high volume of licenses, the enthusiasm exhibited to him by STI when he demonstrated SMART and provided STI access to SMART, and what MGMTL would have required as a lump payment at the time of its meeting with STI in order to give up its rights to SMART.[1]

These conclusions are further bolstered by the testimony of several MARFORRES employees who worked with SMART in the field and reaped the benefits of its use firsthand.

STI's infringement and misappropriation were no accident: they were intentional acts. As a result, MGMTL—which may elect either actual damages or statutory damages for copyright infringement at its option—will demonstrate that STI engaged in willful infringement, which may enhance the amount of statutory damages awarded by the jury. Likewise, because STI's misappropriation was willful and malicious, exemplary damages may be awarded. STI also breached the parties' software evaluation agreement and distributor agreement. Finally, considering STI remains in possession of the infringing software, MGMTL is entitled to a

---

[1] STI objects to this description for the same reasons identified in its motion to limit MGMTL's damages to statutory damages for copyright infringement (no disclosure in Initial Disclosures or Interrogatory Answers). Additionally, any time MGMTL spent on SMART preceded this lawsuit by more than three years. *See Petrella v. Metro-Goldwyn-Mayer, Inc.*, 572 U.S. 663, 671-72 (2014) ("§ 507(b)'s limitations period … allows plaintiffs … to gain retrospective relief running only three years back *from the date the complaint was filed*.") (emphasis added).

permanent injunction.

    **2.**    **Defendant**

        **a.**        **The SMART Software**

Jorge Menes was employed by STI from 2010-2013 as a contractor working at the Marine Forces Reserve ("MARFORRES"), and he developed a rudimentary security management database for the MARFORRES Security Management Office in New Orleans to assist in his duties.

In 2012, Menes paid his uncle, Whit Himel, around $200 to develop the rudimentary database into the Security Management and Reporting Tool ("SMART") software. Menes and Himel claim to have spent thousands of hours developing SMART but provided only rough estimates during discovery. Menes kept track of his hours in a journal, but never produced that journal in discovery.

Menes has never been paid to develop software. Himel has, but his rate was $50 to $65 per hour. Himel reprogrammed SMART for his nephew Menes for almost nothing.

Himel programmed SMART in the Visual Basic for Applications ("VBA") programming language to work with Microsoft Access to generate forms, reports, and letters using data stored in a database. All information populated in SMART comes from a government-owned security management system, the Joint Personnel Adjudication System ("JPAS"), and the forms, reports, and letters created by SMART are controlled by Department of Defense ("DOD") rules, regulations, and policies—including forms and reports that come directly from DOD. Menes and Himel formed MGMTL and submitted portions of the SMART source code to the U.S. Copyright Office in 2013 to obtain a registered copyright. MGMTL did not submit any visual elements of SMART or data fields with its copyright application. MGMTL also did not seek or obtain a copyright on any proposed pamphlets or descriptions of SMART. Since receiving its copyright

registration in September 2013, MGMTL has not revised or updated SMART.

> **b.    MGMTL fails to sell any license to SMART, including to MARFORRES.**

MGMTL provided SMART to MARFORRES for free from approximately October 2012 through September 2014. Menes testified that he hoped to someday license SMART to MARFORRES for $30,000—a price Menes chose because Menes believed it to be the credit limit for government charge cards. MGMTL did not place any restriction on, and reserved no right to control, who could access SMART at MARFORRES. MGMTL also did not have a written agreement with MARFORRES regarding MARFORRES' use of the SMART software. In October 2014, MARFORRES notified MGMTL that it would not purchase a license, with MARFORRES' counsel telling MGMTL's counsel that the "Marine Forces Reserve does not desire to enter into a licensing agreement with your client." MARFORRES never entered into any agreement with MGMTL to purchase a SMART license, nor did it sign off on any "sole source justification."

MGMTL also tried but failed to sell SMART to the Space and Naval Warfare Systems Command ("SPAWAR"), to which Menes pitched SMART around this time. Menes also pitched SMART to a potential distribution partner, GeoInt, under which relationship MGMTL would have been paid by that potential partner based on actual sales, but the parties never signed a contract and the pitch never went anywhere.

> **c.    MGMTL and STI enter into a Distributor Agreement, and STI intends to pay MGMTL based on actual sales.**

Menes approached his former employer, STI, in March 2015 so that MGMTL could "get a foot in the door," claiming that all was finished with MARFORRES and that MARFORRES had "instigated everything." In May 2015, STI and MGMTL entered into a Software Evaluation Agreement. While MGMTL and STI were negotiating a distributor agreement in June 2015, STI

and MGMTL discussed moving SMART v1.0 to a web-based application, and MGMTL then provided STI with updated credentials to access SMART (which expired on June 27, 2016).

Later that year, the parties entered into a Distributor Agreement, which—per its integration clause—superseded the Software Evaluation Agreement. Under the Distributor Agreement, MGMTL appointed STI as an independent, authorized distributor of the SMART software and authorized STI to advertise, promote, and resell products containing SMART. STI agreed it would pay MGMTL the fees set forth in the parties' separate teaming agreement, but the parties never ultimately entered into a teaming agreement. STI intended to pay MGMTL on a "pay when paid" basis where STI would pay MGMTL based on actual sales, if STI made any sales. Any reasonable buyer in STI's position would only pay MGMTL based on actual sales and would not have pay anything upfront, particularly for a product that had never sold. Per its terms, the Distributor Agreement automatically renewed for additional one-year periods unless MGMTL terminated the agreement for cause or provided written notice to STI of non-renewal.

      **d.**      **STI develops a web-based application with comparable functionality to SMART with MGMTL's consent, and the parties' relationship falls apart due to Menes' poor reputation.**

STI discussed developing a web-based software with comparable functionality to SMART with MGMTL via emails and calls throughout March-April of 2016, seeking MGMTL's input. MGMTL was fully aware of this effort and MGMTL, specifically Menes, provided information and assistance in connection with STI's development of the web-based application (including information regarding SMART). Gokul Palani, an employee of an STI affiliate in India that was involved in the development of the web-based application, was included in email chains with Menes. MGMTL knew that Palani was in India. MGMTL also knew of, consented to, and assisted with STI's development of a web-based application with comparable functionality to SMART.

While developing the web-based application, neither STI nor MGMTL were able to generate any interest in SMART. In April of 2016, STI efforts to license SMART to MARFORRES were hindered by Menes' poor reputation. Menes admitted that the animosity toward him had become institutional. Following this, Menes admitted to his business partner at MGMTL that he did not expect to hear back from STI "for a long time."

Approximately a year later, in March 2017, MGMTL reached out to STI. STI explained that MGMTL's reputation hurt STI "very badly" and that it did not want anything to do with MGMTL. In response, MGMTL asked that STI send over the proper legal documentation to terminate their relationship, and MGMTL further demanded that STI turn over all "UNAUTHORIZED, developed materials/software created using [MGMTL's] COPYRIGHTED intellectual property." MGMTL's corporate representative has testified that the "unauthorized" materials being referenced were anything related to the web-based application, which MGMTL knew existed. STI replied that it was not interested in doing business with MGMTL and told MGMTL that the NDA had expired and no other action was required. The Distributor Agreement did not contain an NDA, although Menes' prior employment agreement with STI did. Thus, although MGMTL believed that it was entitled to the return of the web-based software as an "unauthorized" derivative, STI never returned it, and STI and MGMTL's relationship fell apart.

### e.    STI fails to sell its web-based application.

STI designed and programmed a web-based software in an entirely different programming language. While MGMTL programmed SMART in VBA, STI programmed a web-based software with similar functionality—the Personnel Administrative Security System ("PASS")—in the ASP, C#, CSS, HTML5, and JavaScript programming languages. In addition to using different programming languages, PASS uses different database engines, different graphical interface tools,

and different software development tools than SMART, and PASS is executed on a different platform than SMART. For example, PASS is accessed through a browser while SMART runs on PCs running Microsoft Access.

In 2016 to 2017, MARFORRES tested PASS using online credentials. In approximately December 2017, STI also went to the MARFORRES security management office and conducted a demonstration of the PASS software using stand-alone STI computers that were not connected to the network. However, the security management office never used PASS, never installed PASS on its computers, and never procured PASS. This has been confirmed by multiple witnesses from MARFORRES and official correspondence from MARFORRES in response to subpoenas and *Touhy* requests served in this litigation. STI's further efforts to market PASS to other entities failed to generate any interest or sales. STI never sold PASS, never sold a license to use PASS, and never sold any services related to PASS.

> **f.     Expert analysis confirms that STI did not copy the SMART source code and that MGMTL has not suffered any damages.**

STI's software expert analyzed the source code of both SMART and PASS and determined that the PASS source code is not copied from the SMART source code. Indeed, MGMTL's own software expert admits that PASS does not have any lines of code copied from SMART and that the functions and instructions of the two code languages are "quite different." While MGMTL's expert tries to focus on isolated terms, STI's software expert conclusively shows that any such terms were not coined by Menes in the SMART software, were known by STI prior to receiving access to the SMART software and are common in the defense and security industries and are logical to include in the software. Furthermore, STI's expert explains that the SMART and PASS software applications are small and unsophisticated in their design and implementation, and that the functionality, processes, user interface, screen displays, and menu structures found in SMART

and PASS use well-known software practices and, along with the software's output, are dictated by external factors. Indeed, MGMTL's expert admits that a major function of SMART is to rapidly produce accurate reports, forms, and official letters in compliance with DOD rules and regulations, which rules and regulations govern the content and appearance of those reports, forms, and letters and the information that the software must obtain from a user.

STI's damages expert also reviewed the facts and materials in this case and determined that MGMTL did not incur any actual or identifiable prospective losses as a result of the complained of acts and that STI did not have revenues, much less profits, from the complained of acts. MGMTL has never generated any revenue from the sale or licensing of the SMART Software in the over seven years since the copyright was issued in 2013—none before entering into the Distributor Agreement with STI in 2015, none during the term of the Distributor Agreement, and none since the alleged termination of the Distributor Agreement in March 2017. Additionally, MGMTL has not provided any support whatsoever for its projected expected sales or licensing of the SMART software, and given MGMTL's past failures, such projections would be highly speculative. Furthermore, because STI has not generated any revenue from PASS, it did not gain any profits.

MGMTL relies on the opinion of its principal, Jorge Menes, to calculate a reasonable royalty, but Menes' opinion lacks any reliable foundation. Menes calculates a "lump sum" as his reasonably royalty, but Menes himself testified that is not how royalties work, that he never discussed that with STI, and that when he pitched to another potential distributor (that did not enter into an agreement with MGMTL) that deal would have been based on actual sales. Additionally, Menes uses a $30,000 price that he arbitrarily chose based on the spending limit for government charge cards and at which he has failed to ever sell SMART (indeed, MARFORRES refused to

purchase SMART at this price). Furthermore, Menes relies on a minimum of 51 licenses (one for every battalion of MARFORRES), even though he was rejected by a single battalion and has a bad reputation, and he touts further possible licenses, despite no other entities ever showing interest.

## V.   <u>Uncontested Material Facts</u>

1.   MGMTL programmed SMART in the Visual Basic for Applications ("VBA") programming language.

2.   MGMTL submitted portions of the SMART source code when seeking a registered copyright from the U.S. Copyright Office.

3.   MGMTL obtained a registered copyright to the SMART computer program.

4.   MGMTL has not revised or updated SMART since submitting its application for copyright registration in 2013.

5.   MARFORRES did not pay MGMTL for SMART.

6.   MGMTL did not have any written agreement with MARFORRES regarding MARFORRES's use of the SMART software.

7.   STI's company values, as listed on its website, include integrity, respect, and collegiality.

8.   STI provided Gokul Palani, a software developer in India, with access to SMART.

9.   Gokul Palani was not an employee of STI, Inc.

10.   MGMTL and STI entered into a software evaluation agreement on May 27, 2015.

11.   The software evaluation agreement states that "[t]he Licensee [STI] is authorized to install and evaluate the Program for a 30-day evaluation."

12.   The software evaluation agreement provides that the "Licensee [STI] understands and agrees to maintain the Program in confidence to the same extent that Licensee [STI] maintains such confidentiality to protect its own proprietary information."

13.   The software evaluation agreement states that "[t]the Licensor protects its rights to the Program under the United States copyright laws and applicable trade secret laws. Accordingly, Licensee is not authorized to duplicate the Program (other than as necessary to install and operate them), to disclose the Program to persons outside the Licensee's company, or to use the Program for any purpose other than evaluation."

14.   After executing the software evaluation agreement, STI received access to the SMART computer program.

15.    MGMTL provided STI access to SMART from May 31, 2015 to June 27, 2016.

16.    STI received access to SMART's executable files (*i.e.*, its nonliteral elements as displayed on the screen to a user) and its source code (*i.e.*, its literal elements).

17.    STI's access to SMART expired on June 27, 2016.

18.    MGMTL and STI entered into a distributor agreement.

19.    MGMTL and STI agreed in the distributor agreement that STI would pay MGMTL the royalties and/or fees set forth in the parties' separate teaming agreement.

20.    MGMTL and STI never entered into a teaming agreement.

21.    The distributor agreement states: "This Agreement constitutes the entire agreement between the parties with respect to the covered subject matter."

22.    Palani's email address at the affiliate in India was gokul@sti-sspl.com.

23.    A March 24, 2016 email from Palani to Menes also contained Palani's phone number in India.

24.    STI did not communicate with MGMTL from approximately April 2016-February 2017.

25.    On March 21, 2017, Menes of MGMTL wrote to Navaneeth Muthuveerasamy of STI, stating:

> Nav,
>
> I have tried, exhaustively, to reach you and your team about our app and the way ahead.  We are currently in talks with Steve McMurtry and MFR about possibly sourcing our app as a solution for the MFR Security management office.  We have several things to discuss.  Please call me at your earliest and please stop ignoring us and the situation.  MGMTL is currently taking steps to clear up the issues that have defamed us and our stellar product.  We hope to hear from you soon.

26.    On March 23, 2017, Mutheveerasamy responded:

> Hi Jorge –
>
> The last time I spoke with you about a year back, I clearly mentioned that your name hurt us very badly and we didn't want to do anything with you / products. Please DO NOT take STi name when you are selling your services or products. We have nothing to do with your products / services.

27.    Later, on March 23, 2017, Menes replied to Muthuveerasamy, stating:

17

Nav,

No one has ever taken a moment to explain what it is that I am being accused of doing. What are people saying that I did, specifically? I would be more than happy to discontinue the use of STi's name, but we still have an agreement in place that says STi is the exclusive distributor of our SMART App.  If you are not happy with MGMTL, please send over the proper legal documentation dissolving our exclusive relationship; as well as, turn over all UNAUTHORIZED, developed materials/software created using our COPYRIGHTED intellectual property and we can go our separate ways.

We continue to stand behind our software and we are actively marketing its capabilities in the security management arena.  If you would like to talk, I am always available.

28.    Muthuveerasamy responded to Menes, stating:

Hi Jorge –

I don't have the details of what happened, I leave it at that point. To be clear again, We are in no way interested to use or develop your ideas / products. If any customer wants your services / products, go for it.

Please review the NDA that we was signed, it expired long back – No other action required.

29.    In June 2016, STI provided MARFORRES with login credentials to access PASS.

30.    In 2019, STI listed the PASS product on a five-year (2019-2024) United States General Services Administration schedule.

31.    The listed price for PASS on STI's GSA schedule is $214,094 per one-year license.

## VI.    <u>Contested Issues of Fact</u>

32.    Beginning around 1998, Jorge Menes, then a full-time college student, began creating a security management database in his spare time, spending at least 1,000 hours to do so.

33.    Throughout 2012 and 2013, Menes and his partner, Whit Himel, formed MGMTL and refined and improved the database.

34.    Menes spent about 2,000 hours developing and designing SMART (in addition to the 1,000 hours he had already spent establishing the pre-SMART security management database) and Himel spent about 3,000 hours on SMART.

35.   Menes values the software development time put in at $100 per hour, for a total development cost of $600,000.

36.   The SMART software is a tool that works with Microsoft Access to generate reports and letters using data stored in a database.

37.   MGMTL did not submit any visual elements of SMART or data fields with its copyright application.

38.   SMART is a personnel and physical security application capable of instantaneously evaluating thousands of personnel records and applying security clearance guidelines to generate appropriate forms, approvals, and permissions unique to each individual.

39.   Department of Defense rules or regulations do not mandate, require, or provide any guidance as to what a security management software must (or should) include or look like to a user.

40.   MGMTL exhibited creative expression in the design choices it made with respect to the word choice, sequences, organization, structure, menu structures, screen displays, and user interface of SMART.

41.   SMART is a unique, first-in-its field security management application.

42.   The Expired/Expiring Report is an important feature of SMART created and designed by Jorge Menes by relying on his then 15 years' worth of security management experience. This feature of SMART removes any guesswork in identifying and correcting personnel security clearance issues.

43.   SMART is a trade secret that derives independent economic value from the fact that its contents are not readily ascertainable by others and was maintained in confidence so as to limit access and impose restrictions to access.

44.   SMART is used, or is intended for use, in interstate or foreign commerce.[2]

45.   MARFORRES's security manager Steve McMurtry who had "worked in the security field for over 16 years, and [had] managed security programs for 185 Marine Corps Commands" "had never seen anything close to the concise administrative functionality of [SMART]."

46.   SMART is a valuable tool to security management offices, of which there are thousands in the United States and abroad.

47.   McMurtry initiated "sole source justification" paperwork for SMART, which applies when a product is "one of a kind, or it's very special in what it can do."

---

[2] The parties have briefed whether a DTSA claim is in the case. Rec. Docs. 179-180.

48.   The Marine Forces Reserve ("MARFORRES") received limited access to a single license of the SMART executable program (but not its source code) on a trial basis, after which the software expired and became inoperable.

49.   MARFORRES agreed to purchase a one-year license for SMART for $30,000.

50.   MGMTL did not negotiate a contract with MARFORRES to license SMART.

51.   MGMTL did not place any restrictions on, and reserved no right to control, who could access SMART at MARFORRES.

52.   MARFORRES did not enter into a license agreement for SMART with MGMTL.

53.   MGMTL never sold a license to use SMART to MARFORRES.

54.   MGMTL has never sold SMART or a license to use SMART.

55.   MGMTL has never sold software or a license to use software.

56.   No one has ever paid MGMTL to use SMART.

57.   STI has a "proven track record of successfully delivering custom software."

58.   Gokul Palani was tasked with copying SMART and converting it from a Microsoft-Access based program to a web-based program.

59.   STI obligated itself in the software evaluation agreement to maintain SMART in confidence to the same extent that STI maintains such confidentiality to protect its own proprietary information.

60.   STI obligated itself in the software evaluation agreement to not duplicate SMART (other than as necessary to install and operate it).

61.   STI obligated itself in the software evaluation agreement to not disclose SMART to persons outside of STI.

62.   STI obligated itself in the software evaluation agreement to not use SMART for any purpose other than evaluation.

63.   STI obligated itself in the software evaluation agreement to remove SMART from all machines which it had been installed, not to make any copies or backups, and return all originals and related materials in good condition if STI and MGMTL did not enter into a license agreement for SMART.

64.   Had STI not agreed to those terms, MGMTL would not have provided STI with access to SMART.

65.   STI breached the software evaluation agreement.

66.     Pursuant to the distributor agreement, STI acknowledged and agreed that the SMART software is proprietary to MGMTL and that MGMTL retains all right, title, and interest in and to the SMART software including, without limitation, all copyrights, trademarks, patents, and other proprietary rights of any kind.

67.     Pursuant to the distributor agreement, STI acknowledged and agreed that it would make no claims to any copyright, trademark, patent, or other proprietary right in or to the SMART Software in the future.

68.     Pursuant to the distributor agreement, MGMTL had a right to review and approve any end user license agreement that would govern the terms of any user seeking access to SMART.

69.     Pursuant to the distributor agreement, STI acknowledged that MGMTL created and owns SMART plus all derivative works, updates, and new releases relating to SMART.

70.     Pursuant to the distributor agreement, all rights not specifically granted to STI were reserved to MGMTL.

71.     STI obligated itself in the distributor agreement to not reverse engineer, reverse compile, or otherwise disassemble SMART (except as may be permitted by applicable legislation).

72.     STI obligated itself in the distributor agreement to not make any claims to any copyright, trademark, patent, or other proprietary right in or to SMART.

73.     STI obligated itself in the distributor agreement to not make any claims that STI owned SMART or a derivative or update of SMART.

74.     STI breached the distributor agreement.

75.     The distributor agreement does not purport to supersede (or state that it supersedes) the software evaluation agreement.

76.     While MGMTL and STI were negotiating the distributor agreement in June 2015, STI and MGMTL discussed moving SMART v1.0 to a web-based application, and MGMTL provided STI with updated credentials to access SMART.

77.     MGMTL appointed STI as an independent, authorized distributor of the SMART Software, and authorized STI to advertise, promote, and resell products incorporating the SMART software.

78.     STI intended to pay MGMTL on a "pay when paid" basis where STI would pay MGMTL based on actual sales if STI made sales.

79.     A reasonable buyer in STI's position would only pay MGMTL based on actual sales and would not have paid MGMTL anything upfront, particularly for a product that had never sold.

80.     The distributor agreement automatically renewed for additional one-year periods unless

MGMTL terminated the agreement for cause or provided written notice to STI of non-renewal.

81.  Over the course of the relationship between MGMTL and STI, and particularly throughout March and into April of 2016, STI discussed developing a web-based software with comparable functionality to SMART with MGMTL via emails and calls and sought input from MGMTL, and MGMTL (specifically, Menes) provided information and assistance in connection with STI's development of the web-based application.

82.  Each of the above-described emails, which were all sent to or from Menes of MGMTL, include Gokul Palani—an employee at an STI affiliate in India—in the email chain (either on the top-level message or in the email history).

83.  Menes knew that STI had given an Indian company access to SMART.

84.  If MGMTL establishes that Gokul Palani had access to SMART, then MGMTL knew, was fully aware, and consented to Gokul Palani accessing SMART.

85.  MGMTL was fully aware of, consented to, and assisted with STI's development of a web-based application with comparable functionality to SMART.

86.  When Menes first learned from STI that it had begun efforts to convert MGMTL's SMART to a web-based program, he contacted MGMTL's intellectual property lawyer. MGMTL was advised by its intellectual property attorney that by operation of law and the parties' contract, any copy, derivative, or update created of the SMART software would be owned by MGMTL.

87.  MGMTL believed and understood that any web-based version of SMART was, and would be, the property of MGMTL.

88.  In March 2016, STI executives stated in an internal email that SMART is "truly a remarkable tool, and it will sell."

89.  In April 2016 (unbeknownst to MGMTL), STI changed the name of the web-based SMART software from SMART to "PASS."

90.  In April 2016 (unbeknownst to MGMTL), STI copied MGMTL's written promotional materials for SMART nearly word-for-word (even copying MGMTL's typographical and grammatical errors) as promotional materials for STI to use in order to market PASS.

91.  In April 2016 (unbeknownst to MGMTL), STI told its employees and software developer Gokul Palani to stop communicating with MGMTL.

92.  In May 2016 (unbeknownst to MGMTL), an STI executive requested that Menes's IP address be blocked so that he would not be able to access the website housing PASS.

93.  STI never informed MGMTL of its intent to change the name of the software from SMART to PASS.

94.    STI never informed MGMTL that it intended to assert that the web-based SMART (which STI now calls PASS) and that it copied directly from MGMTL's SMART software was somehow the property of STI.

95.    STI omitted MGMTL from all communications in which STI referenced or used the term "PASS."

96.    Menes' reference to "unauthorized" materials meant anything related to the web-based application.

97.    MGMTL believed that it was entitled to the return of the web-based software as an "UNAUTHORIZED" derivative, but STI never returned it.

98.    In March 2017, STI terminated its relationship with MGMTL.

99.    In March 2017, STI informed MGMTL that it had no interest in using SMART or developing SMART in any way.

100.   STI's director of operations represented to MGMTL that (1) STI had no interest in SMART and would not move forward with SMART or take any action related to SMART whatsoever, and (2) STI had no interest in maintaining any form of relationship with MGMTL and that nothing further was needed in order to terminate the parties' contractual agreement.

101.   Based on those unambiguous representations, MGMTL understood that STI had terminated the parties' agreement and that STI would not use SMART, develop anything related to SMART, or take any action related to SMART in any way.

102.   STI has asserted—including in this litigation—that the copyright and associated proprietary rights to SMART belong to STI.

103.   Neither STI or MGMTL was able to generate viable interest in SMART or a web-based SMART product that MARFORRES would purchase.

104.   STI's efforts were hampered by Menes' poor relationship with MARFORRES.

105.   Menes admitted in an email to STI on April 14, 2016 that the animosity toward him had become institutional.

106.   Menes admitted to his business partner at MGMTL, Whit Himel, that he did not expect to hear back from STI for a long time due to the animosity toward him at MARFORRES.

107.   Menes has never sold software or a license to use software.

108.   STI has never sold SMART or a license to use SMART.

109.   STI never sold PASS, a license to use PASS, or any services related to PASS.

110.  After March 21, 2017, MGMTL never made any efforts to market or sell SMART and made the decision not to further market or sell SMART.

111.  SMART and PASS are written in different programming languages, use different database engines, use different graphical interface tools, use different software development tools, and are executed on different platforms.

112.  SMART runs on PCs while PASS runs on websites.

113.  The functions and instruction are quite different for the software languages used for SMART, written in Visual Basic for Applications to operate within Microsoft Access, and PASS, which is web-based.

114.  STI ultimately re-designed and re-programmed a web-based software in a different programming language. Menes programmed SMART in VBA. STI programed a web-based software with similar functionality in ASP, C#, CSS, HTML5, and JavaScript.

115.  STI's web-based application with comparable functionality to SMART is called the Personnel Administrative Security System or "PASS."

116.  The source code of PASS is not copied from the source code of SMART.

117.  Department of Defense ("DOD") rules and regulations control the content, appearance, and formatting of official correspondence, forms, and reports.

118.  A major function of SMART is to rapidly produce accurate reports, forms, and official letters in compliance with DOD rules and regulations. A user may select from a list of form letters and reports, enter the required information, and the software then uses the information to generate the document governed by DOD regulations.

119.  PASS is designed to produce reports, forms, and official letters governed by DOD rules and regulations.

120.  The SMART and PASS software applications are small and unsophisticated in their design and implementation.

121.  The functionality, processes, user interface, screen displays, and menu structures found in SMART and PASS use well-known software practices and, along with the software's output, are dictated by external factors.

122.  The data fields and terms used in SMART and PASS are common in the security and defense industries.

123.  Menes did not coin the terminology used in SMART, and any terms that Menes alleges to have "coined" were known to STI prior to receiving access to the SMART software.

124.   The Joint Personnel Adjudication System ("JPAS") is a government-owned system for security management.

125.   All of the information populated in SMART comes from JPAS.

126.   SMART's function overlaps with the functioning of JPAS.

127.   The Joint Personnel Adjudication System (JPAS) is the Department of Defense (DoD) personnel security clearance and access database. JPAS facilitates personnel security program management for DoD Adjudication Facilities, for DoD security managers, and Sensitive Compartment Information (SCI) program managers. JPAS interfaces with the Defense Security Service (DSS) and the Office of Personnel Management (OPM) to populate personnel security investigation data and the personnel systems, Defense Enrollment Eligibility Reporting System (DEERS) and Defense Civilian Personnel Data System (DCPS), to populate identifying data. JPAS is the system of record for personnel security adjudication, clearance and verification and history. JPAS has two applications. The Joint Adjudication Management System (JAMS) and the Joint Clearance and Access Verification System (JCAVS). JAMS is the application which supports central adjudication facilities personnel and provides capabilities and data such as case management/distribution, adjudication history, due process history, revocations and denial action information, and will have the ability to electronically access personnel security investigative reports from either the DSS or the OPM. JCAVS is the application which supports command security personnel and provides capabilities and data such as local access record capabilities, debriefings, incident file reports and eligibility data, SAP access information and security management reports.

Department of the Navy (DON) commands are required to use JCAVS exclusively to record all access determinations which includes temporary access, upgrades, downgrades, and suspensions. Commands must document interim security clearance determinations, execution of Nondisclosure Agreements (SF-189, SF-189A or SF-312), and personal attestations and use JCAVS to submit continuous evaluation reports, pass visit requests, determine security clearance and Sensitive Compartmented Information (SCI) access eligibility, determine status of requested personnel security investigation (PSI), record PSI submission dates and request DON CAF determinations, record all access determinations, JCAVS users will be responsible for changes to an individual's access with JCAVS.[3]

128.   JPAS is a basic repository for certain information. SMART facilitates the use of various information to management and implement security clearances and applicable documentation. SMART does not duplicate, but rather complements, JPAS.

129.   Individuals at MARFORRES had access to PASS from at least June 10, 2016 to May 31, 2018.

---

[3] This is the verbatim description of JPAS from the Secretary of the Navy (SECNAV). *See* https://www.secnav.navy.mil/dusnp/Security%20Documents/jpas-manual-policy.pdf.

130. STI employees traveled to New Orleans for the purpose of installing PASS at MARFORRES.

131. STI never informed MGMTL that it had distributed PASS to MARFORRES.

132. In May 2017, despite previously recognizing that SMART was copyrighted by MGMTL and proprietary to MGMTL, STI executives authored correspondence articulating that SMART was not MGMTL's proprietary intellectual property.

133. In November 2017, a MARFORRES employee (John Zimmer) familiar with the SMART software informed MGMTL that he had seen individuals installing software at MARFORRES and caught a glimpse of the software on the screen. He had limited information and did not receive access to the software, but he believed it appeared similar to SMART.

134. On or about December 6, 2017, STI came to the MARFORRES security management office ("SMO") and conducted a demo of the PASS software. However, the SMO never used the software, installed the software on computers, or procured the software.

135. In September 2018, Menes first learned the details of STI's conduct when he received an anonymous email (though he did not see the email until a few months later) that stated: "Jorge – I wanted to inform you how STI is cheating you: STI took the SMART application that you built and repackaged it as PASS application and sold to MFR [MARFORRES]."

136. Menes forwarded the whistleblower email so that the veracity of the allegations could be reviewed.

137. STI's PASS used a different programming language than MGMTL's SMART but that STI's source code nevertheless exhibited copying as STI essentially translated MGMTL's source code into a different language (*e.g.*, like translating Harry Potter from English to Spanish).

138. Copyrightable expression embodied in the sequence, organization, structure, screen displays, user interface, and menu structures of SMART was copied by STI and is contained in PASS.

139. The PASS computer program is substantially similar to the copyrightable expression embodied in the SMART computer program.

140. The output forms and letters generated by PASS do not accurately comply with Department of Defense formatting rules where applicable, defeating one of the major reasons that a security management office would benefit from software of this kind.

141. MGMTL would never have provided STI access to its proprietary SMART software if it knew STI would misappropriate and infringe the SMART software in the way that STI did.

142. The listed price for a product on a GSA schedule must be "fair and reasonable."

143. The submissions to the GSA in order to list a product require price substantiation.

144. The GSA's commercial sales practices (CSP-1) form requested "the dollar value of sales to the general public at or based on an established catalog or market price during the previous 12- month period or the offeror's last fiscal year."

145. STI wrote an amount in the millions on the CSP-1 form it submitted to the GSA.

146. This information requested on the CSP-1 form is not specific to PASS or the SIN under which PASS is listed.

147. STI misappropriated MGMTL's trade secret.

148. STI willfully and maliciously misappropriated MGMTL's trade secret.

149. STI infringed MGMTL's copyrighted SMART software.

150. STI's infringement of MGMTL's copyright was committed willfully.

151. STI breached the following obligations in the software evaluation agreement: (i) the obligation to maintain SMART in confidence to the same extent that STI maintains such confidentiality to protect its own proprietary information; (ii) the obligation not to duplicate SMART (other than as necessary to install and operate it); (iii) the obligation not to disclose SMART to persons outside of STI; (iv) the obligation not to use SMART for any purpose other than evaluation; and/or (v) the obligation to remove SMART from all machines which it had been installed, not make any copies or backups, and return all originals and related materials in good condition if STI and MGMTL did not enter into a license agreement for SMART.

152. STI breached the following obligations in the distributor agreement: (i) the obligation not to reverse engineer, reverse compile or otherwise disassemble SMART (except as permitted by applicable legislation); and/or (ii) the obligation not to make any claims to any copyright, trademark, patent, or other proprietary right in or to SMART (including to any update or derivative of SMART).

153. MGMTL has not suffered any damages as a result of STI's challenged actions.

154. The amount of damages MGMTL may be entitled to because STI was unjustly enriched by all of the time, labor, and development that MGMTL invested into SMART and which STI helped itself to for free and received the benefit of through its misappropriation.

155. STI did not cause MGMTL to incur any time, labor, or development costs.

156. STI was not unjustly enriched by MGMTL's time, labor, or development costs because MGMTL's prior work did not save STI any time, labor, or development costs.

157. The amount of damages MGMTL may be entitled to as a reasonable royalty sum for STI's use of unrestricted rights to a SMART license.

158.   The amount of actual damages for copyright infringement (should MGMTL elect to pursue actual damages) to which MGMTL may be entitled.

159.   The amount of statutory damages for copyright infringement (should MGMTL elect to pursue statutory damages) to which MGMTL may be entitled.

160.   The amount of damages to which MGMTL may be entitled if it establishes breaches of the software evaluation agreement.

161.   The amount of damages to which MGMTL may be entitled if it establishes breach of the distributor agreement.

162.   STI's infringement and misappropriation is ongoing and monetary damages cannot compensate for this ongoing harm: STI remains in possession of the infringing software, has listed the software on a 2019-2024 GSA schedule, and continues to this day to hold out the infringing product to the public as if it were its own property and under the name PASS.

163.   MGMTL is entitled to injunctive relief.

164.   Any contested issue of law more appropriately characterized as an issue of fact.

## VII.   Contested Issues of Law

1.   Whether STI breached the parties' software evaluation agreement.

2.   Whether STI breached the parties' distributor agreement.

3.   Whether STI misappropriated MGMTL's trade secret.

4.   Whether STI violated the Louisiana Unfair Trade Secrets Act.

5.   Whether STI violated the Defend Trade Secrets Act.[4]

6.   Whether STI infringed MGMTL's registered copyright of SMART.

7.   Whether MGMTL is entitled to injunctive relief.

8.   Whether MGMTL is entitled to recover its attorney's fees and expenses.

9.   Whether the distributor agreement superseded the software evaluation agreement.

10.   Whether MGMTL's claims for breach of contract should be dismissed for failure to prove damages.

11.   Whether MGMTL's alleged damages for its breach of contract claims are recoverable

---

[4] The parties have filed respective briefs at Rec. Doc. 179-180.

contract damages, including whether development costs are recoverable contract damages.

12. Whether STI's development and marketing of PASS was authorized under the distributor agreement.

13. Whether the distributor agreement was ever terminated in accordance with its terms.

14. Whether STI was required to pay MGMTL under the distributor agreement on a pay when paid basis based on actual sales if STI sold SMART.

15. Whether MGMTL's claims should be dismissed due to lack of damages.

16. Whether MGMTL's copyright claims are barred by the statute of limitations.

17. Whether MGMTL can recover for damages outside of the three year statute of limitations for copyright violation.

18. Whether MGMTL can seek damages that it did not calculate or disclose in its Initial Disclosures or Answers to Interrogatories.

19. Whether a reasonable royalty is beyond the ken of the ordinary juror in the context of software licensing such that the question cannot reach the jury.

20. Whether expert testimony is not required for a jury to award damages—although expert testimony may be a factor in their analysis—and the jury can determine whether there is sufficient evidence for the award of a lump-sum award or other royalty.

21. Whether any aspect of SMART other than the literal source code is protected by copyright.

22. The Court's determination as to what elements of SMART are protectable or unprotectable under copyright law (abstraction/filtration) leaving only comparison for the jury.

23. Whether government forms or reports created by SMART are subject to copyright protection.

24. Whether the menus, forms, or reports created by SMART, which are logically formatted with common DOD information, are subject to copyright protection.

25. Whether SMART's functionality, processes, user interface, screen displays, menu structures, and any other elements are not subject to copyright protection because they are expressions that are standard, stock, or common to its subject matter or are dictated by external factors, including software standards and compatibility requirements, target industry practices and demands, or computer industry programming practices.

26. Whether SMART's functionality, processes, user interface, screen displays, menu structures, and any other elements are not subject to copyright protection because they

represent the only—or one of only a few ways—to express an underlying idea.

27. Whether MGMTL consented to STI's development and marketing of PASS.

28. Whether any use of SMART by STI in developing PASS was a fair use.

29. Whether MGMTL's claim for misappropriation of trade secrets is barred by the statute of limitations.

30. Whether SMART constitutes a trade secret.

31. Whether MGMTL adequately protected the secrecy of SMART.

32. Whether MGMTL's claim for misappropriation of trade secrets should be dismissed for failure to prove damages.

33. Whether summary judgment should be granted in favor of STI on all counts as set forth in Rec. Docs. 93, 93-1, and 122.

34. Whether MGMTL has waived its objections—except for objections under Fed. R. Evid. 402 and 403—to any of STI's exhibits because MGMTL failed to timely assert its objections on May 19, 2021.

35. Whether STI may assert or rely on the introduction of any exhibits or testimony based on an unpled affirmative defense.

36. Whether MARFORRES contracted to purchase a SMART license for $30,000.

37. Whether STI exceeded the scope of any purportedly in effect license or agreement when it infringed MGMTL's intellectual property.

38. Whether the distributor agreement may supersede the software evaluation agreement where it does not purport to supersede (or state that it supersedes) the software evaluation agreement.

39. Whether—in the context of infringement and misappropriation of intellectual property— the fair market value of a reasonable licensee fee may involve some uncertainty and the lack of actual profits does not insulate the defendant from being obligated to pay for what it has wrongfully taken.[5]

40. Whether, as a matter of law, in a computer software infringement case, copyright infringement may be found where there is copying of just the nonliteral elements of the computer software, just the literal elements of the software, or both the literal and nonliteral

---

[5] STI objects to the inclusion of this contested issue of law to the extent it presents a reasonable royalty rate or reasonable licensee fee as a permissible measure of damages for misappropriation of trade secrets. This is an element of a DTSA claim, not a LUTSA claim.

elements of the software.

41. Whether, as a matter of law, a trade secret owner may license the trade secret for use and still take reasonable steps to keep it a secret, such as by executing a license agreement whereby the license acknowledges that the property meets the elements of a trade secret.

42. Whether, as a matter of law, the owner of property is qualified by his ownership alone to testify as to its value.

43. Whether a witness may be precluded from offering any testimony about his own personal time and efforts spent to create a product.

44. Whether, as a matter of law, the limitations period for an infringement or misappropriation claim is triggered when the party knew or should have known of the injury upon which the claim is based.

45. Whether, as a matter of law, each infringing act triggers a separate accrual period.

46. Whether, as matter of law, an act of distribution—the dissemination of a copyrighted work—is a separate act of infringement.

47. Whether, as a matter of law, a registered copyright to a "computer program" extends to both the literal (e.g., source code) and nonliteral (e.g., visual screen displays) aspects of the software.

48. Whether, as a matter of law, copyright protection extends to both the literal elements and non-literal elements—structure, sequence, organization, user interface, screen displays, and menu structures—of software.

49. Whether, as a matter of law, there need only be a minimal level of originality to be subject to copyright protection.

50. Whether, as a matter of law, even if the constituent elements of a user interface or screen display are not independently protected, the particular arrangement of the user interface or screen display are entitled to protection under copyright law.

51. Whether, as a matter of law, STI is liable for all damages that are a direct consequence of its breaches of contract, whether foreseeable or not.

52. Whether, considering STI's injecting a limitations defense, MGMTL must be permitted to introduce evidence that refutes this defense and sets forth the factual basis of what MGMTL knew and when.

53. Whether, as a matter of law, the value of a reasonable royalty rate for use of the property

is calculated at the time the misappropriation or infringement began.[6]

54. Whether, as a matter of law, the proper measure of a reasonable royalty is the fair price for licensing the defendant to put the trade secret to the use as the defendant intended at the time the misappropriation took place.[7]

55. Whether STI is entitled to summary judgment.

56. Whether evidence of events after the date of infringement began are admissible when such evidence may illuminate the pre-infringement value of a license to the intellectual property.

57. The measure of damages, if any, for MGMTL's claims.

58. Any issue of fact more appropriately characterized as an issue of law.

## VIII.   Exhibits Intended to be Introduced at Trial

1. A list of joint/unobjected to exhibits that reflect the trial exhibit numbering and that can be pre-admitted at trial is attached as Exhibit 1.

2. A list of MGMTL's exhibits with STI's objections is attached as Exhibit 2.

3. A list of STI's exhibits with MGMTL's objections is attached as Exhibit 3.

   a. STI's position is that MGMTL did not timely assert its objections to STI's exhibits and MGMTL's objections to STI's exhibits—except for objections under Fed. R. Evid. 402 and 403—are, therefore, waived pursuant to Fed. R. Civ. P. 26(a)(3)(B). The Court's Scheduling Order, as amended, provided for the parties' exhibit lists to be filed and exchanged on May 5, 2021. ECF 72. Fed. R. Civ. P. 26(a)(3)(B) provides that, unless the Court sets a different time, a party may serve objections within 14 days, and any objection not so made— except for objections under Fed. R. Evid. 402 or 403—are waived unless excused for good cause. This Court did not set any different time for objections, thus MGMTL's objections were required to be filed and served no later than May 19, 2021. However, MGMTL missed this deadline and served its objections on June 4, 2021, and MGMTL has not shown any good cause for

---

[6] STI objects to the inclusion of this contested issue of law because the Court has already determined that a reasonable royalty is beyond the ken of an ordinary juror and there is no competent testimony to support this theory. MGMTL disagrees and has briefed the issue at Rec. Doc. 185.

[7] STI objects to the inclusion of this contested issue of law for the same reasons as the above footnote. Additionally, the parties have briefed whether the DTSA is in the case. A reasonable royalty is not a permitted measure of damages under the Louisiana Uniform Trade Secrets Act, and thus a reasonable royalty may not be recovered for misappropriation of trade secrets in this case unless the DTSA claim survives.

this failure. Accordingly, it is STI's position that MGMTL's objections to STI's exhibits—except for objections under Fed. R. Evid. 402 and 403—are waived.

b.  MGMTL regrets that the parties were unable to confer and resolve this issue on their own. Counsel for MGMTL—in accordance with past experience and prior custom and practice of the Eastern District and Local Rule 26.1 that the Court shall set the timing of any Federal Rule of Civil Procedure 26 disclosures— anticipated and understood that exhibits and related objections would be exchanged, discussed, and conferred upon at a mutually agreeable time in advance of confecting the pre-trial order per Rec. Doc. 16-1, p. 5 ("Prior to the confection of the proposed pre-trial order, the parties shall meet, exchange copies of all exhibits, and make a good faith effort to agree as to their authenticity and relevance."). STI e-filed 51 pages of objections to all but two of MGMTL's trial exhibits after 10:00 p.m. on the evening of May 19, 2021 without any discussion with MGMTL or notice to MGMTL that STI interpreted that date to be an ostensible final deadline for exchanging any exhibit objections of any kind. (Indeed, the Rule 26 provision STI invokes (which according to the Local Rules does not apply, states that, absent scheduling deadlines imposed by the Court, the parties are to exchange exhibits at least 30 days before trial. STI received MGMTL's exhibit list on May 4, 2021 many months in advance of trial and received MGMTL's objections to STI's exhibits by June 4, nearly a year before the March 14trial). STI immediately thereafter took the position that MGMTL had somehow waived any objections to any exhibits to be introduced at the March 14, 2022 trial because MGMTL did not articulate its objections by midnight on May 19, 2021 when STI determined that they should be exchanged.

## IX.   Deposition Testimony to be Offered into Evidence

### 1.   Plaintiff

    i.   Anil Augustin (via video deposition designation)

    ii.   Navaneeth Muthuveerasamy (via video deposition designation)

    iii.   STI (via its 30(b)(6) representative Alex Chopra) (via video deposition designation)

    iv.   Barry Levin (via video deposition designation)

    v.   Tyler Boyd (vide video deposition designation)

MGMTL understands from the pre-trial conference that STI will not be permitted to designate via deposition any witness that will be called live at trial (including Whit Himel, Jorge Menes, and Gary Stringham).

**STI's position:** STI reserves the right to move to offer the deposition designation of Menes (MGMTL 30(b)(6) representative). STI does not plan to play these excerpts but reserves the right to seek to do so under Fed. R. Civ. P. 32(a)(3) because Menes is a managing agent of MGMTL and affirmed his testimony as a 30(b)(6) representative. STI does not know exactly how Menes' testimony will come in (including demeanor and content), and disclosed designations out of an abundance of caution.

**MGMTL's position:** MGMTL objects. The Court should not allow this, other than for impeachment, because Menes is available to testify live. The Court may exclude relevant evidence if its probative value is substantially outweighed by a danger of, among other things, confusing the issues, undue delay, wasting time, or needlessly presenting cumulative evidence. (Fed. R. Evid. 403).

Since Menes will be available live, presenting his deposition testimony can serve no purpose other than to confuse the jury and waste time. It should not be permitted. The general rule in the Fifth Circuit is that a "deposition may not be introduced into the record at a trial or hearing for any purpose unless the witness is unavailable or exceptional circumstances justify its admission," *Jauch v. Corley*, 830 F.2d 47, 49–50 (5th Cir. 1987) (emphasis added). Some courts recognize exceptions. With respect to those exceptions, however, the Fifth Circuit has previously ruled where a witness was available that, "[e]ven if the deposition was properly admissible under Rule 32(a)(2), we believe that any possible error was not prejudicial and was, in fact, harmless." *Jackson v. Chevron Chem.Co*., 679 F.2d 463, 466 (5th Cir. 1982).

There are already five key witnesses testifying at trial via lengthy deposition designations, and STI has raised hundreds of objections to such deposition testimony. The Court must review and rule on these objections. Insisting that Menes's deposition testimony also be admitted only burdens the parties and the Court and forces rulings on deposition designations when there is no dispute that the witness will testify live and be subject to cross examination and impeachment.

### 2.  Defendant

STI may offer the following deposition testimony, as indicated in STI's deposition designations, if the need arises, but STI reserves the right not to offer some or all of such deposition testimony and to object to any such deposition testimony:

i.    Any testimony counter-designated by STI

ii.   Jorge Menes (subject to the note above concerning 32(a)(3))

iii.  Steven McMurtry (solely in the event that Mr. McMurtry is unavailable to appear at trial)

iv.   Donald Washington (solely in the event that Mr. Washington is unavailable to appear at trial)

## X.    **Demonstrative Exhibits**

### 1.  Plaintiff

i.    Any charts or tables illustrating software concepts or comparisons of aspects of SMART and PASS

ii.   Timelines and/or diagrams of relevant events and concepts

iii.  Charts summarizing damages[8]

iv.   Blow-ups or annotations of any trial exhibit

v.    PowerPoint of relevant events and concepts

vi.   Demonstrations of running SMART and/or PASS

vii.  Verdict form

---

[8] STI reserves the right to object to any damages not disclosed in the Initial Disclosures and during the discovery process.

    **2.**    **Defendant**

        i.      Timelines of relevant events

        ii.     Explanatory diagrams or graphic representations of relevant events or concepts

        iii.    Demonstrations of the SMART or PASS software, and comparison with JPAS

        iv.    Blow-ups or annotations of any trial exhibit

        v.     PowerPoint presentations addressing relevant events or issues

        vi.    Charts summarizing or explaining alleged damages

        vi.    Verdict form

        vii.    Chart summarizing MGMTL's damages theories (if such theories are permitted by the Court) and demonstratives to aid expert testimony

**XI.**    <u>**Witnesses**</u>

    The parties' respective witness lists were filed in accordance with the Federal Rules of Civil Procedure and prior Court orders, and the parties have exchanged expert reports in accordance with the Federal Rules of Civil Procedure and prior Court orders.

    **1.**    **Plaintiff**

    MGMTL will call the following witnesses at trial

1. Jorge Menes
   MGMTL, contact through counsel

   Menes will testify to his experience in the security management field, his development of a security management database in his spare time and the time and effort spent, his work with Whit Himel to transform his security management database into the SMART software application totaling 6,000 hours at $100 an hour[9], what the SMART application does, his expression and ideas that are embodied in SMART, the efficiencies SMART brings to security management, the value of SMART to MGMTL, the use of SMART at

---

[9] STI objects to any testimony on this as not disclosed in discovery as a bases for damage, not supported, and outside the 3 year copyright damages window.

MARFORRES in New Orleans, his discussions with Steve McMurtry about other locations and facilities where SMART could be used, negotiations with MARFORRES to license SMART, the contracts and discussions between MGMTL and STI, the precautions and measures in place to maintain SMART in confidence, what MGMTL would have required if asked to give up its rights to SMART, the lack of disclosure on the part of STI regarding its efforts to develop PASS, and how MGMTL learned of details giving rise to this lawsuit via a phone call from a former colleague at MARFORRES and an email received by a whistleblower that indicated that STI had stolen MGMTL's software.

2. Whit Himel
   MGMTL, contact through counsel

   Himel will testify to his experience in the computer software industry, his time spent and work performed to develop the SMART software application, MGMTL's discussions and expectations of what it would have required if asked to give up its rights to SMART, and his negotiations with Steve McMurtry of MARFORRES to license SMART.

3. John Zimmer
   4817 Zenith St.
   Metairie, LA 70001

   Zimmer will testify about his experience using the SMART software application; its value, efficiency, and convenience; his participation in a failed effort to have Microsoft create a security management software; the use of the PASS application at MARFORRES and the limited information made available to him regarding that use; and McMurtry's role as a consultant for PASS and his failed efforts to enlist Zimmer's assistance.

4. Tyler Boyd (via video deposition designation)
   Director of Personnel
   Strategic Technology Institute, Inc.
   6000 Executive Blvd., Suite 205
   Rockville, MD 20852

   Boyd will testify about his communications with Jorge Menes leading up to the signing of the evaluation and distributor agreements and his knowledge that SMART was copyrighted; STI's beliefs regarding the value of the SMART intellectual property; STI's decision and efforts to create a copycat version of SMART, change the name to PASS, assert ownership of PASS, and cease all communications with MGMTL; and STI's efforts to promote and market PASS.

5. Barry Levin (via video deposition designation)
   Business Development Manager
   Strategic Technology Institute
   6000 Executive Blvd., Suite 205
   Rockville, MD 20852

Levin will testify about the software evaluation agreement and distributor agreement signed by MGMTL and STI, the terms of the end user license agreement (EULA) submitted to the GSA, STI's marketing and development efforts for SMART and PASS, STI's provision of SMART to Gokul Palani in India, STI's changing the name of SMART to PASS, and STI's marketing and promotional efforts related to PASS.

6. Rakesh Chopra
   President and CEO
   Strategic Technology Institute
   6000 Executive Blvd., Suite 205
   Rockville, MD 20852

Rakesh Chopra will testify about STI's website and company values; STI's decision to create a copycat version of SMART, rename it PASS, assert ownership of the copied project, and exclude MGMTL from any communications that would reveal what STI had done; STI's assertion that SMART is not owned by MGMTL despite STI's contractual promises that it would never advance such an argument; and STI's submissions to the U.S. General Services Administration in connection with listing PASS for a "fair and reasonable" price of $214,094 per one-year license.

7. Alexander Chopra (via 30(b)(6) video deposition designation)
   Deputy CFT Program Manager
   Strategic Technology Institute
   6000 Executive Blvd., Suite 205
   Rockville, MD 20852

Chopra will testify (as STI's Rule 30(b) representative and in his individual capacity) about, among other things, STI's company policies, the agreements STI signed with MGMTL, STI's provision of SMART to Gokul Palani in India to create a web-based version of the software, STI's decision to rename SMART as PASS, STI's intentional decision to end communications with MGMTL and actions to prevent MGMTL from learning about STI's conduct, the visual appearance of PASS and method by which the PASS software was created, STI's provision of PASS to MARFORRES, and STI's inclusion of PASS on the GSA Schedule for a "fair and reasonable" price of $214,094 per one-year license.

8. Navaneeth Muthuveerasamy (via video deposition designation)
   Former Director of Operations at STI
   8820 Columbia 100 Pkwy, 301
   Columbia, MD 21045

Muthuveerasamy testified about the agreements STI signed with MGMTL, STI's relationship with Gokul Palani in India, STI's intent to copy/reverse engineer SMART, STI's decision to cease communications with MGMTL, and STI's representations to MGMTL that it was completely done with SMART and no further action was required with respect to the parties' agreement.

9. Anil Augustin (via video deposition designation)
   Former STI employee
   1312 Windmill Lane
   Silver Spring, MD 20905

   Augustin testified about his role in providing SMART to an Indian software developer to be converted into a copycat version of SMART, his development of PASS marketing materials copied from SMART promotional materials, STI's decision to end communication with MGMTL, and his role in opposing the installation of PASS at MARFORRES.

10. Steven McMurtry (via Zoom testimony at trial)
    245 Warrior Trace
    Covington, LA 70435

    McMurtry will testify about Jorge Menes's performance as a security management officer, how SMART streamlined security management tasks at MARFORRES in New Orleans thus allowing security management personnel to be reassigned to other tasks, how he had never seen anything like SMART in all of his years in the security management field, the value of SMART and potential for licenses, and his work as a consultant with STI.

11. Gary Stringham
    MGMTL expert witness
    Contact through counsel for MGMTL

    Stringham will testify about his credentials, his comparative analysis of SMART and PASS, and his findings that STI's PASS copied the literal and non-literal elements of MGMTL's SMART and that substantial similarity exists between PASS and the copyrightable elements of SMART.

12. James C. Fontana
    MGMTL expert witness
    Contact through counsel for MGMTL

    James Fontana will testify about his credentials in the realm of federal contracting and security management, the requirements for listing a product on a General Services Administration ("GSA") Schedule and the significance of the representations made to the GSA, including the submission of a Commercial Sales Practices (CSP-1) form demonstrating PASS sales and the fact that a listed price on a GSA Schedule is the government determination that the listed price is "fair and reasonable," and the distinctions between SMART and the Joint Personnel Adjudication System (JPAS).

13. Don Washington
    114 Green Trails Drive
    Belle Chase, LA 70037

Washington will testify about his experience in the security management field, about Jorge Menes's performance evaluations, about use of SMART at MARFORRES and how it streamlined and facilitated security management tasks, about STI's efforts to market PASS to MARFORRES and PASS's use at MARFORRES, and about the reasons for which MARFORRES never licensed the PASS software as well as why PASS could not be located at MARFORRES should STI raise the issue.

### 2.      Defendant

STI will call the following witnesses:

1.  Rakesh Chopra
    Strategic Technology Institute, Inc.
    6000 Executive Blvd, Suit 205
    Rockville, MD 20852 (may be contacted only by counsel)

Mr. Chopra is STI's chief executive officer and has knowledge of STI and its business activities. He is expected to testify to the business of STI, its employment of Mr. Menes, the circumstances surrounding the contracts and the development of PASS, involvement by Navaneeth Muthuveersamy in these events, the fact that STI never sold SMART or PASS, and Mr. Chopra may rebut as necessary factual assertions of the plaintiff about STI and may further testify to substantiate any factual defenses.

2.  Expert Witness Joseph T. Gardemal, III
    Alvarez & Marsal Disputes and Investigations, LLC
    655 15th Street, NW
    Washington, DC 20005
    (may only be contacted through counsel)

Mr. Gardemal will testify regarding his credentials and expertise in damages analysis, accounting, and valuation, and will testify to his expert opinions, in accordance with his expert report, derived from his damages analysis in this case, including the lack of actual or prospective losses of MGMTL, how STI did not gain any profits from the complained of acts, and that Mr. Menes' opinion regarding MGMTL's compensable damages is speculative and unreliable.

3.  Expert Witness Jonathan L. Krein
    Source Code Discovery, LLC
    2028 E. Ben White Blvd, Ste 240-8738
    Austin, TX 78741
    (may only be contacted through counsel)

Dr. Krein will testify regarding his credentials and expertise in software development and will testify to his expert opinions, in accordance with his expert report, derived from his analysis of SMART and PASS, including that: the PASS source code is not copied from the SMART source code; Menes and MGMTL did not coin terminology found within the SMART and PASS software; the functionality, processes, user interface, screen displays, and menu structures found in SMART

and PASS use well-known software practices and, along with the software's output, are dictated by external factors; STI did not need to use clean room procedures when developing PASS; and that SMART and PASS are small, unsophisticated applications that use common software practices.

    4.  Jorge Menes, personally and as corporate representative of MGMTL
        (will be contacted through counsel)

Mr. Menes will authenticate documents and communications and testify: that he has never sold a license to software or been paid to develop software; that MGMTL has never sold SMART or a license to use SMART; MGMTL did not enter into a teaming agreement with STI; that MGMTL was aware of and had participated in the development of a web-based application with comparable functionality to SMART; that MGMTL understood its business relationship to have ended with STI following emails in March 2017; that in that March 2017 email exchange MGMTL sought the return of all materials related to the web-based application, which it believed was an unauthorized derivative of SMART, but that MGMTL never received these materials; that MGMTL did not try to sell or license SMART after March 2017, and—solely if permitted to testify in Plaintiff's case to his opinion regarding the value and reasonable licensing fee for SMART—his lack of expertise in calculating fair market value, licensing fees, or damages and the lack of basis for his opinion regarding the value and reasonable licensing fee for SMART. Depending on the plaintiff's case, STI will also attempt to challenge any testimony concerning damages or value and elicit testimony favorable to STI on these points. STI also expects Mr. Menes to testify concerning the creation and development of SMART and the purpose and function of SMART and how it interacts with security data, his communications with MARFORRES, his activities in trying to sell or promote SMART.

    5.  Representatives of the Marine Forces Reserve
        Marine Forces Reserve
        Office of Counsel
        2000 Opelousas Avenue
        New Orleans, LA 70146

The Representative will authenticate documents and communications between MARFORRES and the parties, the foundation and authenticity of which MGMTL has objected to.

    6.  Ron J. Bald[10]

_____

[10] MGMTL objects to the inclusion of this witness as he was not identified on STI's witness list (Rec. Doc. 184). MGMTL does not object to the authenticity of any exhibits, so no witness is needed to authenticate any documents. MGMTL objects to witnesses who were not disclosed and deposed offering substantive testimony.

    **STI position:** STI disputes MGMTL's objection because STI in its Witness List expressly reserved the right to call authenticity witnesses to the extent that MGMTL objects to the authenticity of STI's exhibits. STI also identified representatives of MARFORRES as witnesses on its Witness List. STI has provided MGMTL with an affidavit from the custodian of records (making his documents non-hearsay), but MGMTL is still maintaining its hearsay objection.

120 Rue Holiday
Slidell, LA 70461

Mr. Bald will authenticate emails between himself and MGMTL's former counsel, the foundation of which MGMTL has objected to.

STI may, if the need arises, present the following witnesses at trial, either live or by deposition testimony

1. Whit Himel (including by deposition designation)[11]
(will be contacted through counsel)

Mr. Himel, Co-owner of MGMTL, may testify about his past pay rates for software development work, his compensation for his work developing SMART, MGMTL's failure to update SMART since 2013, the lack of any sales or licensing of SMART by MGMTL, and the lack of any marketing of SMART by MGMTL since March 2017.

2. Navaneeth Muthuveerasamy (by deposition designation)
11015 Ralston Rd
Rockville, MD 20852

Mr. Muthuveerasamy testified regarding: Menes' and MGMTL's involvement in the development of a web-based application with comparable functionality to SMART; the lack of value of SMART; how Menes' relationship with MARFORRES negatively impacted STI; and his communications with Menes of MGMTL in March 2017.

3. Steve McMurtry
245 Warrior Trace
Covington, LA 70435

Mr. McMurtry may testify about his duties and responsibilities as security manager at MARFORRES New Orleans; Menes' previous work as an employee of STI for MARFORRES; Menes' termination with Cherokee Nation working as a contractor for MARFORRES; the ensuing investigation at MARFORRES; Menes' lawsuit against McMurtry; MARFORRES' decision not to license SMART or PASS; the lack of any sales or licensing of SMART or PASS; and the lack of any interest in PASS.

4. Donald Washington
114 Green Trails Drive
Belle Chase, LA 70037

Mr. Washington may testify about his duties and responsibilities as deputy security manager of MARFORRES New Orleans; that MARFORRES never purchased SMART; that MARFORRES never purchased or licensed PASS or any services related to PASS; that MARFORRES tested

---

[11] For the reasons articulated above in Part IX, MGMTL objects to STI's indication that Mr. Himel may appear at trial via deposition designation since he is subject to subpoena.

PASS and STI demonstrated PASS to MARFORRES, but MARFORRES never used or procured PASS; that PASS was never loaded onto any MARFORRES computers; and that MARFORRES never used the PASS software on the computers from STI's demonstration, which were stand-alone STI computers that were not connected to the MARFORRES network.

5.  John Zimmer
    4817 Zenith St
    Metaire, LA 70001

Mr. Zimmer may testify about Jorge Menes' work at MARFORRES while an employee of STI and his lack of knowledge regarding the events that he communicated to Menes in approximately November 2017.

6.  Any witnesses identified or disclosed by MGMTL or who may be called to testify at trial by MGMTL.

7.  Any expert witnesses identified or disclosed by MGMTL or who may be called to testify at trial by MGMTL.

8.  Any witnesses necessary to authenticate documents.

9.  Any witnesses necessary for rebuttal or impeachment purposes.

10. STI reserves the right to rely on affidavits and record custodian testimony to the extent necessary to support the admission into evidence of any third-party records.

## XII.   <u>Jury Trial</u>

This case is a jury case. All issues except MGMTL's request for permanent injunction and post-judgment fees are to be tried by jury.[12] MGMTL requests injunctive relief regarding STI's alleged ongoing infringement and misappropriation, which may be granted on such terms as the Court may deem reasonable.

The issue of liability will not be tried separately from that of quantum.

---

[12] STI does not agree with this sentence. The question of copyrightability (abstraction, filtration), whether the distributor agreement supersedes the software evaluation agreement, whether MGMTL has evidence from which a jury could find actual damages (or reach a reasonable royalty determination), and other legal questions must be decided by the Court.

**MGMTL's position:** MGMTL does not agree with these contentions and objects to STI's raising these issues—not raised in a motion for summary judgment—now, long after the parties' original submission of the pre-trial order and the week before trial.

### XIII.   <u>Other Matters</u>

MGMTL raises the following matters:

1.     Any specific procedural considerations to be discussed in light of MGMTL's request for damages (to be awarded by the jury) paired with its request for injunctive relief (to be adjudicated by the Court).

2.     Confirmation that the parties will not be permitted to argue or raise purely legal questions (*e.g.*, that literal and nonliteral elements of software are capable of copyright protection and the legal requirements for submitting and obtaining a registered copyright for computer software) before the jury.

STI believes it is necessary to raise the following matter with the Court at the pre-trial conference or prior to trial:

1.     Is there a DTSA claim in the case?

2.     What is copyrightable (abstraction/filtration)?

3.     Will the Court determine as a matter of law that the distributor agreement supersedes the software evaluation agreement?

4.     What damages may MGMTL seek in light of its failure to disclose damages in discovery, the 3 year copyright limit, and subject to STI's pending motion?

### XIV.   <u>Trial Date</u>

Trial of this matter shall commence on March 14, 2022 at 9:00 a.m.

The trial is estimated to last 7 days.

Proposed jury instructions, special jury interrogatories, and voir dire shall be electronically filed with the Court not later than five working days prior to the trial date.

This joint pre-trial order has been formulated after a conference at which counsel for the respective parties participated. Reasonable opportunity has been afforded counsel for corrections, or additions, prior to signing. Hereafter, this order will control the course of the trial and may not be amended except by consent of the parties and the Court, or by order of the Court to prevent manifest injustice.

The possibility of settlement of this case was considered.

Respectfully Submitted,

/s/ Harold J. Flanagan
Thomas M. Flanagan (#19569)
Harold J. Flanagan (#24091)
Camille E. Gauthier (#34558)
Dennis O. Durocher, Jr. (#36441)
FLANAGAN PARTNERS LLP
201 St. Charles Ave. Suite 3300
New Orleans, Louisiana 70170
Telephone: (504) 569-0235
Facsimile: (504) 529-0251
tflanagan@flanaganpartners.com
cgauthier@flanaganpartners.com
hflanagan@flanaganpartners.com
ddurocher@flanaganpartners.com

Attorneys for MGMTL, LLC

/s/ Nicholas M. DePalma
James Y. Boland (pro hac vice)
Nicholas M. DePalma (pro hac vice)
Taylor S. Chapman (pro hac vice)
Christian R. Schreiber (pro hac vice)
VENABLE LLP
8010 Towers Crescent Drive, Suite 300
Tysons, VA 22182
Telephone: (703) 760-1997
Facsimile: (703) 821-8949
jyboland@venable.com
nmdepalma@venable.com
crschreiber@venable.com

Micah J. Fincher (#33830)
Michael W. Magner (#01206)
Jones Walker LLP
201 Saint Charles Ave., Suite 5100
New Orleans LA, 70170-5100
Telephone: (504) 582-8464
Fax: (504) 589-8464
mfincher@joneswalker.com

Attorneys for Strategic Technology
Institute, Inc.

_____
**Honorable Wendy B. Vitter**
**United States District Judge**

45